**UNITED STATES of America, Appellee,**

v.

**Carmine ROMANO and Peter Romano, Defendants-Appellants.**

**Nos. 1175, 1185, Dockets 82–1052, 82–1054.**

United States Court of Appeals, Second Circuit.

Argued May 26, 1982.

Decided June 24, 1982.

Certiorari Denied Nov. 15, 1982. See 103 S.Ct. 375, 376.

---

Robert Lewis Cohen, New York City, for defendant-appellant Peter Romano.

Norman A. Olch, New York City (Dolan, MacMahon & Martine, New York City, Louis J. Martine, New York City, of counsel; William Lupo, Legal Asst.), for defendant-appellant Carmine Romano.

Daniel H. Bookin, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty., S. D. N. Y., Andrew J. Levander, Walter P. Loughlin, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before LUMBARD, MOORE and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Carmine and Peter Romano appeal from judgments of conviction entered on February 5, 1982, in the Southern District of New York, following a jury trial presided over by the Hon. Lee P. Gagliardi. The Romanos were convicted for their roles in a racketeering conspiracy to extract protection money from the wholesalers in the Fulton Fish Market. They accomplished this through their control of the union representing the workers in the market. Specifically, both defendants were convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); of violating RICO, 18 U.S.C. § 1962(c); and of aiding and abetting violations of the Taft-Hartley Act, 29 U.S.C. § 186(b)(1) and 18 U.S.C. § 2. In addition, Carmine Romano was convicted of misusing union pension funds, 18 U.S.C. § 1954 and 18 U.S.C. § 2; and Peter Romano was convicted of obstruction of justice, 18 U.S.C. § 1503, and perjury before a grand jury, 18 U.S.C. § 1623. Prior to jury deliberations, the government dropped one count of extortion, 18 U.S.C. § 1951, charged against Carmine. The court sentenced Carmine to twelve years in prison and a fine of $20,000; Peter received a sentence of eighteen months' imprisonment. Finding no errors in the district court's rulings of law or in its conduct of the trial, we affirm.

In August 1981, the Romanos were charged in a 167-count indictment. Their alleged co-conspirators were severed prior to trial and the Romanos were tried on a redacted indictment of 94 counts.

Count One charged the defendants with conspiring to conduct the affairs of the Fulton Fish Market through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). The predicate acts of racketeering activity were alleged to include "among other things, acts of extortion in violation of Title 18, United States Code, Sections 1951 and 2; payment and receipt of illegal labor payments in violation of

Title 29, United States Code, Section 186 and Title 18, United States Code, Section 2; misuse of welfare and pension plan funds in violation of Title 18, United States Code, Sections 1954 and 2; and obstruction of justice in violation of Title 18, United States Code, Section 1503."

Among the objects and means of the conspiracy, it was charged that the defendants: (1) "would and did request and receive through, among other things, the use of fear, cash payments and other things of value from businesses in the Fulton Fish Market;" (2) "would and did request and receive through, among other things, the use of fear, approximately $66,450 from businesses in the Fulton Fish Market, supposedly in return for renting cardboard signs stating that said businesses employed members of Local 359;" (3) "did request and receive through, among other means, the use of fear, payments from businesses in the Fulton Fish Market in return for 'protection' against thefts and robberies, and did operate a protection service known as the Fulton Patrol Service . . . ;" and (4) "received for their own use and the use of their relatives and friends numerous things of value in return for depositing the funds of the Fulton Fish Market Welfare and Pension Funds into a particular bank."

Count Two charged the defendants with a substantive RICO violation, 18 U.S.C. § 1962(c). The predicate acts of racketeering activity alleged were the receipt by Carmine and Peter Romano of illegal payments in violation of 19 U.S.C. § 186(b)(1); the misuse of union pension funds by Carmine Romano, in violation of 18 U.S.C. § 1954; and the obstruction of justice by Peter Romano in violation of 18 U.S.C. § 1503.

Carmine was also charged with twelve counts of violating 18 U.S.C. § 1954 and 18 U.S.C. § 2 in connection with the receipt by him and others of television sets from the Republic National Bank as gifts for sponsoring the opening of new accounts with moneys from the union pension fund.

Counts Fifteen through Sixty and Sixty-one through Ninety-one charged Carmine

and Peter respectively with aiding and abetting violations of the Taft-Hartley Act in connection with the rental of cardboard union signs to employers in the Fulton Fish Market for $300 per year. 29 U.S.C. § 186(b)(1); 18 U.S.C. 2.

Carmine was also charged with one count of personally receiving a payment of $300 from the Booth Fisheries Co. in violation of 29 U.S.C. § 186(b)(1). Prior to submission of the case to the jury, the court dismissed, at the prosecutor's request, a count charging Carmine with extortion, 18 U.S.C. § 1951, in connection with the receipt of that payment after the witness to that count failed to testify.

Finally, Peter was charged with perjury before the grand jury, 18 U.S.C. § 1623, and with obstruction of justice, 18 U.S.C. § 1503, in connection with his false statement that he did not possess any materials responsive to a subpoena duces tecum related to the union sign rentals.

### I.

The Fulton Fish Market, located just south of the Brooklyn Bridge in lower Manhattan, is the source of most of the fresh fish sold in New York. Every day from about 2 a. m. to about 8 a. m. the market is packed with trucks delivering their perishable cargoes and with customers (mostly retailers and restaurateurs) picking up their day's requirements. At the center of the market are two buildings, Old and New Markets, which together house about 80 wholesalers. The approximately 800 employees of these wholesalers, who are members of Local 359 of the United Seafood Workers Union, handle the fish from the time it arrives in the market until the time that it leaves.

Carmine Romano was the Secretary-Treasurer of Local 359 from May 1974 until May 1980, when his brother, Peter Romano, took over. Carmine then assumed a newly created position (at $650/week) as the Executive Administrator of the Fulton Fish Market Welfare and Pension Trust Funds ("pension fund").

In 1975, the association of wholesalers located in the New Market, the New York Wholesale Fish Dealers Association ("Fish Dealers"), approached Carmine Romano for assistance in stopping the thefts plaguing the market. The existing watchmen's service was ineffective, and the Fish Dealers thought that Carmine would be able to protect them. The president of the Fish Dealers testified that "I figured that if the thieves knew that the union was looking out for us, that they wouldn't bother us.... Because they would be afraid of the union."

Shortly thereafter, Carmine created a watchmen's service called the Fulton Patrol Service. Although Carmine's name did not appear on any of the documents related to the Fulton Patrol, ample evidence tied him to the Patrol. For example, he presented the plan to the wholesalers and settled claims for reimbursement by companies that suffered thefts.

The Fish Dealers hired the Fulton Patrol Service for $1300 per week and the number of thefts in the New Market dropped dramatically. However, the Old Market, which had not hired the Fulton Patrol Service, continued to suffer high theft rates. Accordingly, in 1977 the Fulton Fishmongers Association (composed of the merchants located in the Old Market) ("Fishmongers") also hired the Fulton Patrol Service. Soon thereafter, the Old Market saw its pilferage rate drop. Between November 1975 and August 1981, the Fulton Patrol Service collected over $644,000 from the wholesale fish merchants located in the Fulton Fish Market.

Viewing the evidence in the light most favorable to the government, the jury could well have concluded that the Fulton Patrol's success in stemming the tide of thefts was due to the influence that Carmine and his co-conspirators exerted over the thieves in the market and not to the quality of its watchmen service. The deficiencies in the Patrol's operations were manifest. For example, one of the Patrol's watchmen (the brother-in-law of John Pontebbi, the man who ran the Patrol's day-to-day operations) was a kleptomaniac who was known to steal fish from the market himself. A number of watchmen listed on the payroll (and whose checks were regularly cashed by union employees) did not exist. One watchman who did exist and who patrolled on Friday and Saturday nights had previously performed the same services for the prior, unsuccessful watchmen's service. He testified that he knew of only one other watchman who actually worked for the Patrol. Finally, a woman friend of Carmine's was paid $200 per week to receive "less than one call a week" from watchmen not reporting for work.

Substantial evidence also demonstrated the union's influence over the market's thieves. For example, Pontebbi put a former union delegate, Anthony O'Connor (charged in the indictment as a co-conspirator and presently a fugitive from justice), on the payroll because he thought O'Connor knew who the thieves were and could recover any fish that were stolen. Carmine's brother, Vincent Romano, was hired for the same reason at $450 per week. Although Pontebbi claimed that O'Connor and Vincent Romano were hired to watch the other watchmen, none of the men who actually patrolled Fulton Market ever saw either man there.

Companies that suffered thefts came to Carmine Romano when they wanted reimbursement from the Fulton Patrol Service, which guaranteed against theft. After the burglary of Booth Fisheries, Carmine told the president of Booth that he "hoped to get the people that committed the burglary, and if they did .... they would be sorry they were born." After Peter took over control of Local 359, companies reported thefts to him.

The evidence also showed that the union systematically collected cash "Christmas payments" from the wholesalers in the Fulton Fish Market each December from 1975 through 1979. To insulate Carmine Romano and the other union officials, the payments were ordinarily solicited and collected by other businessmen, who told the solicitees that the money ($300 per wholesale

stand per Christmas) was for "the boys at the union." A number of businessmen testified that they would not have made these "Christmas payments" if they had not been asked to, and that they believed the payments to be illegal. When asked why he had paid, Arnold Smith, of Caleby Haley & Co. said, "because everybody else was paying it and because we did not wish to create problems where no problems existed." In December of 1979, the Fishmongers Association gave $2400 to the union in lieu of individual contributions. This money was paid, as were all the contributions, in cash.

Occasionally, the union officers were directly involved in collecting the "Christmas payments." In December of 1977, either Carmine Romano or Anthony O'Connor approached the president of Commercial Fish Co., Philip Bartone, and said "everybody was going along giving to the boys [in the union] for Christmas," instructing Bartone to drop the money off at the T & S Fish Co.[1] In December 1978, an employee of Booth Fisheries personally delivered Booth's $300 "Christmas present" to Carmine Romano.

Another method used to extract money from the Fulton Market merchants was the rental of cardboard union signs to them for $25 per month. The businessmen who rented these signs did so because everyone else was doing it and in spite of the fact that many of them believed the rentals to be illegal. Most testified that the signs (which arguably had some goodwill value) were not worth $25 per month—yet no one ever stopped renting. The president of M. P. Levy and Co., Terrence Levy, even placed the sign under the air conditioner, out of sight, while continuing to pay the $25 each month. Bartone testified that he rented the sign even though it wasn't worth the money because "I thought it was necessary to get [a union sign] to run the business. I didn't like the idea, but I thought it was

necessary to continue running my business."

Another scheme by which Carmine Romano and his co-conspirators profitted was through the misuse of union welfare and pension funds. Between 1974 and 1979, Carmine, as trustee of the pension fund, directed the deposit of over $168,000 of the pension fund's money in the Republic National Bank, keeping for himself and his co-conspirators over $10,000 worth of color television sets given by the bank as gifts to the sponsors of new accounts.

Republic National Bank officials testified that the bank gave these gifts regularly to the sponsors of new accounts. Only the sponsor, and not the account's owner, was eligible to receive the gift. However, the sponsor could designate anyone (other than the owner) to receive the gift. Moreover, if asked, the bank would have given cash rather than the television sets. Thus, the sponsors could have taken the gifts in the form of cash and turned it over to the pension fund. Here, however, the sponsors of the pension fund's new accounts (two union secretaries, the union accountant, and union delegate Anthony O'Connor) turned over to the pension fund none of the seventeen color television sets given by the bank as gifts for sponsoring the new accounts. Furthermore, if the moneys had been deposited in a savings bank, rather than the Republic National Bank, the pension fund would have received $10,000 more in interest than it received from the Republic National Bank. Neither Romano nor the other trustees disclosed in the minutes of the pension fund that they had received these TV sets, nor did they disclose the gifts in the annual report to the beneficiaries of the pension fund or in reports required to be filed with the Department of Labor.

On January 14, 1981, Peter Romano in response to a subpoena requiring him to produce for the grand jury "All records,

---

1. Following his instructions, Bartone gave $300 to Julius Sirowitz, the boss of the T & S Fish Co., telling him, "This is for the boys in the union." Sirowitz apparently collected "Christmas payments" from other wholesalers, too. For example, he told Terrence Levy, president

of M.P. Levy & Co., that he was "elected" to collect $300 for Carmine Romano and Anthony O'Connor. In this instance, however, Levy refused to pay because the union had not sent anyone to his father's funeral and he was still upset about the lack of respect that showed.

papers, correspondence, and documents in any way related to union shop cards, union signs or union plaques . . . ," falsely testified before the grand jury that he had no such documents. In fact, he had and knew that he had in his possession: (1) a telegram from the International President of the United Food and Commercial Workers Union (with which Local 359 was affiliated), advising him that rental of union signs violated the union constitution, and (2) a copy of a letter from the International's Vice-President to the International President advising of a conversation with Peter Romano in which Romano had indicated he would immediately stop the rental of union placards.

Neither defendant took the stand at trial. Peter Romano called no witnesses; Carmine Romano called two witnesses who testified that the union's welfare and pension benefits increased during his tenure and that commercial banks offer some advantages over savings banks despite the lower rate of interest.

The trial concluded on October 30, 1981, when the jury convicted the defendants on all counts and found that they should forfeit their union positions under 18 U.S.C. § 1963. Prior to sentencing, the court revoked Carmine Romano's bail and remanded him to custody as a continuing danger to the community. We affirmed that order on November 3, 1981.

The court conducted a sentencing hearing on February 2 and 3, 1982, at which government witnesses testified to Carmine Romano's ties to the Genovese organized crime family, to the fear he generated in the Fulton Fish Market, and to his control of a number of illegal activities there. The court found that "the Fulton Fish Market is permeated by fear generated by organized crime, and . . . the proceeds of illegal activities are going to the coffers of organized crime . . ." It sentenced Carmine to twelve years and a $20,000 fine, noting that there

"is enough in this case in connection with Mr. Carmine Romano, outside of what I heard and even the [sentencing] hearing here to justify the sentence that I am going to impose in this case."

## II.

■ The principal issue in this case is whether the receipt by Carmine Romano and his co-conspirators of television sets given by the Republic National Bank as gifts for the opening of accounts by the union pension fund constituted a crime under 18 U.S.C. § 1954. That statute punishes any trustee of an employee pension benefit plan who "receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan. . . ." Here, Carmine received (and aided others to receive) television sets as gifts because of his actions in directing the deposit of union pension funds, and with the intent to be influenced in the disposition thereof.[2] Carmine concedes that his conduct falls "within the literal sweep of the statute's language." However, he argues that the receipt of those gifts was not illegal because it was proper to deposit union pension funds in a bank that gives gifts to all members of the public opening accounts. Although keeping the television sets might have constituted embezzlement, he argues, their receipt was lawful. We disagree.

Romano's argument rests on indications in the legislative history that Congress was most concerned with kickbacks. Since the gifts-for-deposit were not kickbacks, but were offered on non-preferential basis to all depositors, he argues that the statute should not be interpreted to reach his conduct. And indeed, kickbacks were the main concern of Congress. *See* S.Rep.No.908,

---

**2.** Although § 1954 does not require proof of a corrupt intent, the court instructed the jury that to convict on these counts it had to find that the defendant acted with a "bad purpose," and "with the specific intent to do something

the law forbids." By its verdict, the jury necessarily found that Carmine Romano received the gifts with corrupt intent. The defendant did not object to these instructions.

87th Cong., 1st Sess., 4–5, 11 (1961); 108 Cong.Rec. 1730 (remarks of Rep. Roosevelt) (1962). However, the legislative history reveals that Congress intended to reach "other conflict-of-interest payments" as well as kickbacks. H.R.Rep.No.998, 87th Cong., 1st Sess. 7 (1961), U.S.Code Cong. & Admin. News 1962, p. 1532, and to establish "Federal criminal sanctions for violations of trust." 108 Cong.Rec. 1924 (1962) (remarks of Sen. McNamara). Thus, Congress used very broad language to prohibit receipt of "any fee, kickback, commission, gift, loan, money, or thing of value," rather than just kickbacks. Moreover, the statute punishes the receipt of any of these things either "because of," or "with the intent to be influenced" with respect to, any action or decision concerning a pension fund. If only corrupt transactions were intended to be covered, Congress would not have added the "because of" clause, but would have limited the statute to those possessing the intent to be influenced.[3] In short, the broad language used in the statute reflects Congress's intent to reach all fiduciaries who profit (other than by their regular compensation) as the result of their decisions to invest union pension funds.[4]

Romano also claims that this construction of the statute is a "technical" one that punishes the receipt of "customary" business gifts and is therefore contrary to the interpretation of the Department of Justice. S.Rep.No.908, 87th Cong., 1st Sess., 15–16 (1961). However, the receipt of over $10,-000 worth of color television sets cannot be deemed a "de minimis business or social gratuit[y]." *Id.* Nor, in view of the jury's finding that Carmine had the specific intent to violate the statute, can this be deemed a "technical," innocent violation.

Romano's argument that he should have been prosecuted for embezzlement under 18 U.S.C. § 664 rather than under § 1954 is also unavailing. Section 664 punishes the embezzlement of "any of the moneys, funds, securities, premiums, credits, property, or other assets of any" union pension plan. Had Carmine been charged under this statute, he surely would have argued that the television sets were not the property of the pension plan, as the bank did not give (and would not have given) the sets to the pension fund, but only to the individual sponsors of new accounts.

■ Next, Carmine Romano argues that the district court improperly admitted evidence of the "Christmas payments," the Fulton Patrol Service, and the state of mind of the wholesalers. This evidence, he asserts, was irrelevant and prejudicial. These errors were compounded, he claims, by the prosecutor's summation and rebuttal.

We find no error in the district court's evidentiary rulings. Count One of the indictment charged Carmine with conspiring to conduct the affairs of the Fulton Fish Market through a pattern of racketeering activity. This pattern was alleged to include extortion in the form of the Fulton Patrol Service protection racket, the collection of "Christmas" gifts from the Fulton Market merchants, and the "rental" of union placards. Clearly, proof of such activities was relevant to the charge of conspiracy, as was proof that the wholesalers made these payments to the union of fear. Carmine's complaint seems to be that the court instructed the jury only as to the predicate acts of racketeering activity charged in the substantive RICO count, which did not include extortion. However, his failure to object to the charge bars that claim here.

■ Second, we hold that the prosecutor's repeated references to the fear generated by Carmine Romano in the Fulton Fish Market were not improper. In his summation, the prosecutor was entitled to argue

---

**3.** Even if Congress intended to limit the statute to corrupt transactions, the jury found that Carmine Romano possessed the corrupt intent to be influenced in the deposit of the union's pension funds. *See* note 2, *supra*.

**4.** The statute expressly permits a fiduciary to receive a "bona fide salary" or "compensation" for "services actually performed in the regular course of his duties as ... trustee...." 18 U.S.C. § 1954. Of course, the defendant's receipt of the television sets was not such compensation.

that the conspiracy charge—which alleged payments extracted through the use of fear—had been proven by the evidence. Nor was the rebuttal improper in view of the defendants' closing arguments that the union sign rentals did not constitute extortion and that there was no evidence that the wholesalers "signed that [rental] agreement out of fear, out of threats, out of intimidation."[5]

◼ The defendants also argue that their convictions for conspiracy must be reversed because the conspiracy count was predicated on Taft-Hartley violations, 29 U.S.C. § 186(b)(1), which require no *mens rea* (*i.e.*, knowing or criminal intent). They reason that "one cannot conspire to commit a crime which does not require proof of *mens rea*." However, the defendants were not charged with conspiring to violate the Taft-Hartley Act; they were charged with conspiracy to violate the RICO statute, 18 U.S.C. § 1962. Moreover, the court instructed the jury that it must find intent to conspire, and that "with an understanding of the unlawful character of a plan, [the defendant] knowingly and wilfully join[ed] in an unlawful scheme." To the extent that conspiracy requires proof of "corrupt motive or intent," as the defendants claim, the charge gave the defendants everything to which they were entitled. *See United States v. Scotto*, 641 F.2d 47, 55–56 (2d Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).[6]

◼ Nor is there any merit to Carmine Romano's claim that the twelve-year sentence imposed on him was improper because the district court did not make specific findings after the sentencing hearing and thus may have relied on false information in sentencing him more severely than his brother. The district court specifically stated that the sentence was justified by what it knew of Carmine Romano's background even without reference to the sentencing hearing.[7] Indeed, our review of the trial transcript suggests that the sentence was lenient.

◼ The claim that the defendants were deprived of a public trial because the district court locked the courtroom doors while it charged the jury is frivolous. Members of the public were permitted to be and were present within the courtroom during the charge. Locking the door while the charge was read was a reasonable limitation to ensure that the jury was properly instructed without distraction. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581–82 n.18, 100 S.Ct. 2814, 2830 n.18, 65

---

5. Defendants also claim that the prosecutor improperly argued that the "union plaque was a fake and a sham and the International Secretary had never signed it." The prosecutor's remarks were fair comment on the physical evidence and went to the defendants' intent to conspire to violate the RICO statute.

6. The defendants argue that the enhancement of non-*mens rea* misdemeanors (the Taft-Hartley violations) into a felony under RICO, 18 U.S.C. § 1962(c), is unconstitutional. This argument is frivolous. *United States v. Scotto, supra*.

7. The court may have been referring to the fact, emphasized by the prosecutor in his argument at the sentencing hearing, that two witnesses had chosen to suffer imprisonment for contempt rather than testify at trial following the grant of immunity. One, Alec B. Messing, of the Messing Fish Co., had already served 90 days and been fined $66,000 for a similar refusal to testify in a parallel civil case. Messing's lawyer told the court (out of the presence of the jury) that the reason his client refused to testify was that death threats had been made against Messing and his family. Similarly, Glenn Kaggen, an employee of Messing Fish Co., continued to refuse to testify even after the judge sentenced him to six months imprisonment for civil contempt. He told the judge the reason he would not answer any questions was "fear."

Moreover, there was ample evidence adduced at trial showing that Carmine was feared throughout the Fulton Fish Market. For example, the union's long time accountant, Walter Cole, admitted (after a minute of dead silence in which he weighed his answer) that the reason he lied to the grand jury about Carmine's participation in the Fulton Patrol Service was because he was afraid of Carmine. Frank Bearese, of the Finest Fillet Co., testified that when he was first asked for a $300 Christmas payment to the union in 1975, he felt "[s]ort of a sick feeling in my stomach because it had never happened before in all the years I have been down in the market."

L.Ed.2d 973 (1980). Indeed, no one even tried to enter the courtroom while the doors were locked.

■ Equally without merit is Peter Romano's claim that he was denied due process because the government failed to give him fair notice that rental of union signs violated the Taft-Hartley Act even though he assumed union office one year after the Government began its investigation. The government was under no obligation to inform him that his conduct violated the law. That obligation arises only in those rare cases where the "conduct made criminal is wholly passive and ... 'circumstances which might move one to inquire as to the statutory duty are completely lacking.'" *United States v. Keuylian*, 602 F.2d 1033, 1043 (2d Cir. 1979). Here, the collection of money from the Fulton Market merchants could hardly be described as "wholly passive." And it stretches the imagination to suggest that in these circumstances Peter Romano was completely unaware that such transactions were illegal.

■ Peter Romano also claims that his false grand jury testimony was not material. He does not contest the sufficiency of the evidence that he deliberately lied when he told the grand jury that he held no documents responsive to a subpoena duces tecum seeking records relating to rental of union signs to employers. Those documents, if produced, would clearly have helped the grand jury inquiry. For example, they were probative of his state of mind, which was relevant to the possible RICO and extortion charges. Thus, the perjury was material under 18 U.S.C. § 1623. *See United States v. Berardi*, 629 F.2d 723, 728 (2d Cir.), *cert. denied*, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980).

■ The defendants' final claim is that the district court erred in admitting the hearsay evidence about the Christmas payments. Eight wholesalers testified that they made cash "Christmas payments" to other wholesalers at the request of the latter, and were told that the money was for the union. The issue is whether the district court clearly erred in finding there was sufficient independent evidence that there was a conspiracy, that each defendant was a member of that conspiracy, and that the statements were made in furtherance of that conspiracy. *See United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). After reviewing the trial record, we cannot say that the district court's finding was clearly erroneous. For example, Carmine Romano personally accepted one of the "Christmas payments." Peter Romano admitted to one wholesaler that people in the market gave money to the union at Christmas time. The evidence linking the co-conspirators to the conspiracy is the fact that they picked up the money. Even if the district court's *Geaney* finding was clearly erroneous, the requests to give the money to the "boys in the union" were admissible as "an utterance which was contemporaneous with an independently admissible nonverbal act ... and which relates to that act and throws some light upon it." *United States v. Glasser*, 443 F.2d 994, 999 (2d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

Accordingly, the judgments of conviction are affirmed. The mandate shall issue forthwith.