Robert W. LATZER, Petitioner,

v.

Robert ABRAMS, Attorney General of the State of New York, Respondent.

No. 84 Civ. 3693.

United States District Court, E.D. New York.

Feb. 21, 1985.

Patrick M. Wall, New York City, for petitioner.

Anthony J. Girese, Bruce E. Whitney, Asst. Dist. Attys., Nassau County, Mineola, N.Y., for respondent.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

This is a petition for a writ of habeas corpus brought under 28 U.S.C. § 2254. Petitioner was convicted, after a jury trial in County Court, County of Nassau, of committing sodomy in the second degree by engaging in sexual acts with a thirteen year old boy, Christopher T. Petitioner was sentenced to an indeterminate term of imprisonment with a minimum of one year, eight months, and a maximum of five years. He appealed to the Appellate Division, Second Department, of the Supreme Court of the State of New York. The Appellate Division unanimously affirmed the judgment of conviction, without an opinion. *People v. Latzer*, 101 A.D.2d 1030, 475 N.Y.S.2d 963 (2d Dept.1984). Petitioner's subsequent application for leave to appeal to the New York Court of Appeals was denied. *People v. Latzer*, 63 N.Y.2d 708, 469 N.E.2d 110 (1984).

Petitioner asserts three claims in support of his petition for a writ of habeas corpus. First, he contends that his confrontation rights under the Sixth and Fourteenth Amendments of the United States Constitution were violated by the trial court's refusal, pursuant to the New York "rape shield" statute, N.Y.Crim.Proc.Law § 60.42, to permit cross-examination of two prosecution witnesses with respect to their sexual activ-

ities with persons other than petitioner. Second, petitioner contends that he was denied due process by an impermissibly suggestive in-court identification. Lastly, he argues that his Sixth Amendment right to a public trial was impaired by the trial court's order to lock the courtroom doors during the court's charge to the jury.

After thoroughly reviewing the record in this case, this Court concludes, for the reasons that follow, that petitioner's confrontational rights guaranteed by the Sixth and Fourteenth Amendments were violated when the cross-examination of two key witnesses was unduly restricted. Accordingly, the petition for writ of habeas corpus should be granted.

## Background

### A. The Incident

The alleged events which form the basis of the crime charged against petitioner occurred during one day in December of 1980.[1] On that day, three brothers, Matthew T., age 12, Christopher T., age 13, and Anthony T., age 14, traveled from their home in New Jersey to the home of one Martin Swithinbank in Baldwin Harbor, Nassau County, New York. There they were introduced to a man named "Bob Fox,"[2] whom each brother identified at trial as the petitioner, Robert Latzer. The five ate dinner at Swithinbank's house and then traveled to a local theatre to see the play *Grease*.[3]

After *Grease*, the five returned to the Swithinbank home. Anthony went to sleep in a room on the first floor. Christopher and Matthew testified that Christopher and Swithinbank then went to an upstairs bedroom while Matthew and Fox remained in the dining room downstairs. Fox allegedly performed a sexual act with Matthew and then they both went upstairs, where Fox allegedly performed the sexual act with Christopher which constituted the basis of the sodomy charge. Matthew and Fox then returned downstairs where Fox allegedly performed a further sexual act with Matthew. The next day, the brothers left the Swithinbank home and returned to New Jersey.

From May 4, 1981 to July 11, 1981, members of the Nassau County Police Department Vice Squad conducted an investigation into allegations of illicit sexual activities occurring at the Swithinbank home. The police maintained surveillance on the Swithinbank home in Baldwin and on an apartment building in Manhattan where Swithinbank allegedly maintained an apart-

1. The parties have contested the exact week in December 1980 during which the alleged events occurred. The indictment charged that the crime occurred in December 1980. In response to petitioner's pretrial request for greater specificity of the date, the prosecuting attorney stated that "after extensive interviews," neither the victim, Christopher, nor his brother, Matthew, were "able to specify the date with greater exactitude." (Appellant's [Petitioner's] Appendix submitted to the Appellate Division, Second Dep't, at 110 ("A. 110")). Petitioner maintains that before the Grand Jury, Christopher testified that the incident occurred in the beginning of December and Matthew testified that the incident occurred "during the first week of December." A. 122. At trial, petitioner presented alibi evidence indicating that he was traveling in the western United States during the first ten days of December. Christopher then testified that the date of the event was in the "beginning of December," A. 294, but his brothers, Anthony and Matthew, and their mother, testified that the event occurred in the middle of December. A. 264, 357, 371.

2. There is a minor discrepancy in the brothers' accounts of when they first met Bob Fox. Anthony and Christopher testified that they met Fox when he accompanied Swithinbank in picking up the brothers at the Baldwin train station. A. 253, 323. Matthew stated he and his brothers did not meet Fox until they arrived at the Swithinbank home. A. 350–51.

3. There was also some controversy regarding the testimony of Christopher and Matthew that they saw a *play* called *Grease*. A. 253–54, 324. Both Christopher and Matthew testified that they had never before been to a show with live actors, A. 283–84, 295, 351, though Christopher had previously been to a rock concert. A. 283–84. The prosecutor used this testimony in summation to support her argument that the brothers' identification testimony was credible because they spent an entire evening with the alleged assailant that was "a special evening like seeing a show...." A. 471–72. However, Christopher and Matthew had originally told the police that they saw a *movie* called *Grease* on the night in question. A. 295, 352.

ment and conducted his business. On July 4, 1981, Officer Gordon Bradberry was watching the Manhattan building when he saw a man he later identified as Robert Latzer leave the building. Officer Bradberry testified that he observed Latzer load up a car and then get into the car along with Swithinbank and Matthew. The officer and his partner followed the car to Baldwin. A. 384–386.

On July 11, 1981, the police executed a warrant to search the Swithinbank house. Swithinbank was arrested that same day. A warrant for the arrest of petitioner was issued on July 30, 1981.

### B. *The Trial*

At trial, the defense focused on the claim that Latzer had been mistakenly identified as the "Bob Fox" who had allegedly committed the crime of sodomy. There were several inconsistencies in the testimony of the brothers, in addition to those discussed in the preceding footnotes, that tend to support the defense of mistaken identification. First, Christopher originally described Bob Fox to the police as being 5'5" tall. A. 300, 306. At trial, Latzer was measured at 5'9½" without shoes and 5'10¾" with shoes. Second, Matthew originally described Fox as having grey hair. A. 356. Officer Bradberry, who saw Latzer with Matthew on July 4, 1981, described Latzer's hair as dirty blond. A. 385. Third, Matthew, when first interviewed by the police on July 12, 1981, stated that he had "met" Bob Fox on July 4, 1981 in Swithinbank's apartment in Manhattan. During that first interview, Matthew did not mention any sexual incident with Fox in December 1980. A. 341–46. Matthew first mentioned the December 1980 incident when interviewed by a different detective two days later on July 14, 1981, but during that interview Matthew failed to mention that Anthony had traveled with Christopher and him to Swithinbank's home at the time of the alleged incident. A. 344. At trial, Matthew testified that he first met Fox in December 1980. A. 322.

Petitioner challenges three adverse rulings made by the trial court. The first contested ruling involves the trial court's repeated denial of petitioner's requests for disclosure of certain statements made by Christopher and Matthew, and the repeated denial of requests for permission to cross-examine those boys with respect to their sexual relations with men other than petitioner. Shortly after the arrest of Swithinbank, Christopher and Matthew gave several statements to various police officers. Some of those statements, and the boys' Grand Jury testimony, purportedly indicate that the boys had relations with a number of different men at the Swithinbank home.[4]

Petitioner's initial pretrial request for discovery of those statements was denied by order of the trial court. At the beginning of the trial, petitioner requested permission to cross-examine the boys regarding their sexual activities with other men, and also requested copies of all portions of the disputed statements that might be considered "exculpatory" material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The request regarding cross-examination was denied. A. 213. The court agreed to inspect the statements in camera for *Brady* material. After such inspection, the court stated that "[n]one of this material is relevant to defendant Robert Latzer" and declined to direct that the statements be turned over to petitioner. A. 215. Petitioner renewed his request for the statements just prior to the cross-examination of Christopher. The request was again denied. A. 291–92. After the prosecution's summation, petitioner requested permission to recall Christopher and Matthew to elicit testimony regarding their sexual encounters with other men. This

---

4. Those statements and the Grand Jury testimony were not submitted to this Court. The statements and Grand Jury record were sealed by order of the trial court. There is testimony on the record, however, indicating that the brothers made numerous trips to the Swithinbank house. Anthony testified that he had been to the house "about ten" times and Matthew testified that he had visited the house "around 20" times. A. 251, 321.

request was also denied. A. 488–89, 502–05.

Petitioner's second objection is to the trial court's ruling in allowing an allegedly suggestive in-court identification of Latzer and the court's refusal to strike that identification. At the trial, Anthony identified Latzer in court as "Bob Fox" by pointing to Latzer who was seated at the defendant's table. Anthony had never previously been asked to identify Latzer as "Bob Fox," either in person, by photograph or otherwise, during the 22 months since the December 1980 incident.

Petitioner's third objection is to the trial court's order that the courtroom doors be locked during the court's charge to the jury. In response to petitioner's post-trial objection to the practice, the court noted that "[t]he public was not excluded during the charge. They merely were limited in their coming and going for a short period of time. No one who was present when the charge began was denied the right to hear and see the court charge the jury." A. 136.

All three claims asserted by petitioner before this Court were raised in petitioner's appeal to the Appellate Division. Respondent correctly concedes that petitioner has fully exhausted his state remedies on all three claims raised here. Those claims are therefore appropriate for review on the merits in this habeas corpus proceeding.

*Discussion*

Petitioner contends that the trial court's ruling which prohibited cross-examination of the brothers with respect to their sexual conduct deprived petitioner of rights guaranteed by the confrontation clause of the Sixth Amendment. Respondent maintains that the court's ruling was a proper application of the New York "rape shield" statute, N.Y.Crim.Proc.Law § 60.42. Under that statute, evidence of a victim's sexual conduct is inadmissible in a sex crime trial unless such evidence satisfies certain conditions specified in the statute.[5] The salutary purpose of that statute is to prevent cross-examination from "focusing upon the immaterial issues of the victim's chastity [which] tends to demean the witness, discourages the prosecution of meritorious cases and leads to acquittals of guilty defendants." Memorandum of Assemblyman Stanley Fink, accompanying Assembly Bill No. 6698, Senate Bill No. 4821, N.Y.Legis. Ann. (1975) at 47–48. The ultimate question in the present case is whether, under the particular circumstances presented here, the policies embodied in the rape shield statute must yield to petitioner's constitutional right to confront witnesses called to testify against him.

The right of a criminal accused to cross-examine the prosecution's witnesses "is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation.... It is, indeed, 'an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.'" *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973), *citing Pointer v. Texas*, 380 U.S. 400, 405, 85

---

**5.** Section 60.42 provides:

Evidence of a victim's sexual conduct shall not be admissible in a prosecution for an offense or an attempt to commit an offense defined in article one hundred thirty of the penal law unless such evidence:

1. proves or tends to prove specific instances of the victim's prior sexual conduct with the accused; or

2. proves or tends to prove that the victim has been convicted of an offense under section 230.00 of the penal law within three years prior to the sex offense which is the subject of the prosecution; or

3. rebuts evidence introduced by the people of the victim's failure to engage in sexual intercourse, deviate sexual intercourse or sexual contact during a given period of time; or

4. rebuts evidence introduced by the people which proves or tends to prove that the accused is the cause of pregnancy or disease of the victim, or the source of semen found in the victim; or

5. is determined by the court after an offer of proof by the accused outside the hearing of the jury, or such hearing as the court may require, and a statement by the court of its findings of fact essential to its determination, to be relevant and admissible in the interests of justice.

S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965) (other citations omitted). The right to cross-examine is not absolute. It is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation," *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), "and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers,* 410 U.S. at 295, 93 S.Ct. at 1046. However, state evidentiary rules which unduly restrict or prohibit cross-examination may deprive a criminal defendant of his rights under the confrontation clause, even if the evidentiary rules serve otherwise valid state interests. *Davis,* 415 U.S. at 319, 94 S.Ct. at 1111.

In *Davis,* the petitioner was convicted of burglary in connection with the theft of a safe from a bar. Richard Green, a juvenile, provided crucial testimony for the prosecution. He testified that he had a conversation with the defendant who was at the time standing beside a car implicated in the crime and located at the place where the stolen safe was later discovered. At trial, the petitioner opposed a protective order which prohibited cross-examination of Green with respect to his being on probation for a prior adjudication as a juvenile delinquent. The petitioner argued that the juvenile record was probative of Green's possible bias or motive to testify falsely so as to shift possible suspicion away from Green himself. The trial court excluded any such evidence, relying on provisions of Alaska law that prohibited the admission of evidence concerning juvenile adjudications in later court proceedings. 415 U.S. at 309-11, 94 S.Ct. at 1107-08.

The Supreme Court in *Davis* first noted that the "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316-17, 94 S.Ct. at 1110-11. The Court then weighed the competing interests of the state and the petitioner. While recognizing that the state had a legitimate interest in preserving the anonymity of juvenile offenders, the Court observed that the excluded evidence could have done "[s]erious damage to the strength of the state's case.... In this setting we conclude that the right of confrontation is paramount to the state's policy of protecting a juvenile offender." *Id.* at 319, 94 S.Ct. at 1112. The Court reversed the judgment affirming the petitioner's conviction. *Id.*

The threshhold question in the present case is whether the *Davis* holding is applicable where, as here, a state evidentiary rule is invoked to exclude cross-examination challenging the credibility of identification testimony. The lower federal courts have regularly applied the *Davis* balancing test to hold that the Sixth Amendment rights of criminal defendants have been violated by various restrictions on the cross-examination of witnesses for improper motive or bias.[6] State courts construing rape shield statutes have similarly concluded that sex crime defendants cannot constitutionally be prohibited from cross-examining victims with respect to their sexual

6. *See, e.g., Greene v. Wainwright,* 634 F.2d 272 (5th Cir.1981) (restriction on cross-examination regarding the mental condition of the witness and ongoing criminal proceedings against him); *Chipman v. Mercer,* 628 F.2d 528 (9th Cir.1980) (restriction on cross-examination regarding the witness' dislike for the defendant's aunt); *United States v. Williams,* 592 F.2d 1277 (5th Cir. 1979) (restriction on cross-examination regarding witness' status as an informant and a possible deal with the government for the witness' testimony); *U.S. ex rel. Santiago v. Vincent,* 423 F.Supp. 103 (S.D.N.Y.1976), *aff'd* 573 F.2d 1295 (2d Cir.1977), *cert. denied* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978) (restriction of cross-examination of witness' knowledge that her brother had been arrested for the crime for which the defendant was being tried). *But see Johnston v. Pittman,* 731 F.2d 1231 (5th Cir. 1984), *cert. denied,* — U.S. —, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985) (restriction on cross-examination regarding a rape victim's past sexual relationship with the investigating officer held constitutional); *United States v. Houghton,* 554 F.2d 1219, 1225-26 (1st Cir.1977), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977) (restriction on cross-examination regarding bias held constitutional where "no specific parts of the record ... suggest any showing of bias in the testimony of any of the government agents").

history for purposes of showing the victim's possible improper motive or bias in testifying. *See, e.g., Winfield v. Commonwealth,* 225 Va. 211, 301 S.E.2d 15 (1983); *Commonwealth v. Joyce,* 382 Mass. 222, 415 N.E.2d 181 (1981); *State v. Jalo,* 27 Or.App. 845, 557 P.2d 1359 (1976) (en banc). To avoid such potential constitutional problems, the courts in at least two states have also narrowly construed rape shield statutes so as to permit the introduction of evidence concerning a rape victim's prior sexual activity to rebut specific elements of proof offered by the state.[7]

While these cases do establish that, under *Davis,* rape shield rules must yield to a criminal defendant's right to cross-examine witnesses for bias or improper motive, the cases do not conclusively establish whether the defendant has a similar right to cross-examine witnesses with respect to possible sources of mistaken identification (i.e., faulty memory). There is substantial authority, however, upon which to base such an extension of the *Davis* doctrine. The most analogous case was decided by the Sixth Circuit, which held that a trial court could not constitutionally prohibit a defendant from cross-examining witnesses with respect to suppressed out of court identifications where the witnesses were permitted to identify the defendant in court. *Flowers v. State of Ohio,* 564 F.2d 748 (6th Cir.1977).[8] The court noted that the "state's asserted interest in the finality of suppression, similar to the state's interest in *Davis,* must fall before defendant's fundamental right of confrontation ... as to the credibility of the in-court identifications." *Id.* at 750.

Further support for extending the *Davis* rule to this case can be drawn from the observation that challenges to both bias and faulty memory have been traditionally treated as comparably important forms of impeachment. In *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Supreme Court observed that the right to confront and cross-examine government witnesses is important both where the individuals' "memory might be faulty" and where the individuals might be "motivated by malice, vindictiveness, intolerance, prejudice or jealousy." *Id.* at 496, 79 S.Ct. at 1413. In *Davis,* the Supreme Court noted that the partiality of a witness is "always relevant as discrediting the witness and affecting the weight of his testimony." 415 U.S. at 316, 94 S.Ct. at 1110, *citing* 3A Wigmore, *Evidence* (Chadbourne rev. 1970). Weinstein and Wigmore have similarly observed that credibility of a witness can always be attacked with proof that "his capacity to observe, remember or narrate is impaired." 3 J. Weinstein, *Weinstein's Evidence,* ¶ 607[04], at 607–44 (1982), *citing* 3A Wigmore, *Evidence,* § 931–935, 989–995 (Chadbourne rev. 1970). These authorities indicate that impeachment by proof of bias or faulty memory are of equal importance and therefore should be accorded comparable protection by the confrontation clause. Accordingly, I conclude that under *Davis,* undue restriction of cross-examination that is probative of a witness' faulty memory may deprive a criminal defendant of rights guaranteed by the Sixth Amendment.

The determination of whether the confrontation clause has been violated in any

---

7. *See State v. LaClair,* 121 N.H. 743, 433 A.2d 1326 (1981) (cross-examination as to victim's prior sexual activity permitted (1) to challenge victim's credibility through a prior inconsistent statement that she was a virgin; and (2) to rebut the inference that presence of sperm in victim's vagina tended to prove intercourse with the defendant); *State v. Howard,* 121 N.H. 53, 426 A.2d 457, 462 (1981) (evidence of prosecutrix's prior sexual activity admissible to attack her credibility where the "average juror" probably would not believe that the "prosecutrix has the experience and ability to contrive a statutory rape charge"); *Shockley v. State,* 585 S.W.2d 645 (Ct. of Crim.App.Tenn.1978) (evidence of prosecutrix's prior sexual activity admissible to rebut inference that her pregnancy proves intercourse with the defendant).

8. The suppressed identification evidence included both the victims' initial inability to identify the defendant in a photographic lineup and their subsequent identification of him in person under highly suggestive circumstances. At trial, the defendant relied on a defense of mistaken identification. 564 F.2d at 749.

individual case requires a close "examination of all [the] circumstances and evidence." *Chipman v. Mercer,* 628 F.2d 528 (9th Cir.1980). In the present case, petitioner has raised substantial questions as to the veracity of the brothers' identification testimony. As discussed above, there were discrepancies between the brothers' initial descriptions of "Bob Fox" and the actual appearance of Robert Latzer at trial. Furthermore, Matthew initially stated that he first met Fox in July 1981, over six months after the date of the alleged crime. Petitioner had thus established a sufficient foundation for his defense of mistaken identification to justify cross-examination of the brothers regarding their sexual history for purposes of further supporting that defense. Petitioner was not seeking to launch a generalized challenge to the witnesses' credibility by adducing evidence to besmirch their reputation for chastity. Rather, the prohibited cross-examination would have been directed toward challenging a critical element of the state's case— the identity of the alleged criminal. The trial court's absolute prohibition on any questions regarding the brothers' sexual history deprived petitioner of his constitutional right to "a certain threshhold level of cross-examination...." *Chipman,* 628 F.2d at 530. *See also Greene v. Wainwright,* 634 F.2d 272, 275 (5th Cir.1981); *Commonwealth v. Joyce,* 382 Mass. 222, 415 N.E.2d 181, 188 (1981). Under such circumstances, the state's interest in shielding the brothers from questions regarding their sexual history must yield to the petitioner's right to confront witnesses called to testify against him. *See Davis,* 415 U.S. at 320, 94 S.Ct. at 1112.[9]

Respondent conceded at oral argument that *Davis* might be applicable where a court unduly restricted cross-examination regarding misidentification, but argues that the particular evidence excluded in the present case is not relevant to the brothers' identification of petitioner. In making this argument, respondent relies on the trial court's in camera determination that the sealed statements given by Christopher and Matthew to police officers did not contain any *Brady*[10] material, and respondent's own discussion of the contents of those statements in its memorandum of law submitted to this Court. Neither of these sources provides an appropriate basis for determining the relevance of the brothers' sexual history. As discussed earlier, neither petitioner nor this Court has seen the disputed statements. Consequently, in the proceedings before both courts, petitioner was seriously hindered in his ability to argue about the relevance of the events contained in those statements, resulting in a possible denial of his due process rights. *See In re Taylor,* 567 F.2d 1183, 1187–88 (2d Cir.1977). Furthermore, it is not clear from the record that the trial court's refusal to order disclosure of the statements reflects a determination that the statements are not relevant to a defense of mistaken identification. The court's ruling may have been based solely upon a determination that the statements did not contain material considered "exculpatory" under *Brady.* Even if it is assumed that the sealed statements describe only irrelevant events, there is no assurance that those statements, which were presumably elicited through sympathetic questioning by police, reflect all the sexual activities of the brothers which might be revealed through cross-examination. As the Supreme Court has observed:

> Counsel cannot often learn in advance what pertinent facts may be elicited on cross-examination. For that reason, it is

---

**9.** As Professor Vivian Berger noted in her extensive critique of the evidentiary rules applied in rape cases:

> In order to assess the rape shield laws one must ask whether these state interests, as embodied in particular statutory standards applied in specific factual contexts, outweigh the defendant's valued right to meet the prosecution's case with proof that he is indeed inno-

cent. Where the balance inclines toward the accused, any provision excluding his evidence cannot be squared with the Constitution.

V. Berger, *Man's Trial, Woman's Tribulation,* 77 Col.L.Rev. 1, 55 (1977).

**10.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

necessarily exploratory.... To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.

*Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931).

The precise meaning of "relevant evidence" has long been a subject of lively scholarly debate. *See generally* 1A Wigmore, *Evidence,* §§ 24–37.7 (Tillers rev. 1983). Perhaps the most pragmatic definition of relevancy, however, is set forth in Rule 401 of the Federal and Revised Uniform Rules of Evidence:

> 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

In this case, the trial court prohibited cross-examination as to facts which could tend to disprove a critical element of the state's case by making it more probable than it would otherwise appear that the brothers mistakenly identified petitioner as the man who committed the alleged sodomy. The prohibited cross-examination would therefore have addressed a facially relevant line of inquiry. If the trial court doubted whether any or all aspects of the brothers' sexual activities were of sufficient similarity to the crime charged to be probative of mistaken identification, the court had broad discretion to limit the scope or means of cross-examination. *Alford,* 282 U.S. at 694, 51 S.Ct. at 220; *United States v. Brown,* 511 F.2d 920, 923 (2d Cir.1975). For example, the court could have held a special hearing to determine the relevance of the specific sexual activities of Christopher and Matthew, N.Y. Crim.Proc.Law § 60.42(5), or required the development of an appropriate foundation before the description of each incident, or limited the depth of inquiry into the details of each relationship. The court chose, how-ever, to completely bar any inquiry into this facially relevant subject matter. This absolute bar on cross-examination impermissibly restricted petitioner's Sixth Amendment rights. *Greene,* 634 F.2d at 275; *Chipman,* 628 F.2d at 530; *Joyce,* 415 N.E.2d at 188.

The final question is whether this deprivation of petitioner's Sixth Amendment rights warrants setting aside petitioner's conviction. While *Davis* implied that prejudice need not be shown when an accused is denied the right of effective cross-examination, 415 U.S. at 318, 94 S.Ct. at 1111, the clear rule in this Circuit is that a writ of habeas corpus should not issue where violations of the confrontation clause are "harmless beyond a reasonable doubt." *Klein v. Harris,* 667 F.2d 274, 290 (2d Cir.1981), *citing Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *U.S. ex rel. Santiago v. Vincent,* 423 F.Supp. 103, 106 (S.D.N.Y.1976), *aff'd* 573 F.2d 1295 (2d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). The Second Circuit noted, however, that "a reviewing court should not lightly find a constitutional error to have been non-prejudicial...." *Klein,* 667 F.2d at 290. In this case, the excluded evidence, when viewed in conjunction with the inconsistent identification testimony already on the record, could possibly have raised a reasonable doubt as to petitioner's guilt in the mind of the jurors. The full impact of the excluded evidence cannot be determined on the basis of the present record because petitioner was never permitted to adduce any evidence concerning the sexual activities of the brothers. I therefore cannot find that the constitutional error in this case was harmless beyond a reasonable doubt.

Accordingly, it is hereby ordered that the petition for a writ of habeas corpus is granted unless the state affords petitioner a new trial within sixty (60) days of the issuance of the order herein. It is further ordered that petitioner shall remain released on bail, pursuant to the terms of the Order of this Court dated September 12,

1984, pending the final determination of this petition.

In light of the above, I find it unnecessary to address the second and third claims raised in the petition for a writ of habeas corpus.[11]

SO ORDERED.

---

**11.** Petitioner contends in his third claim that he was denied his Sixth Amendment right to a public trial by the trial court's order that the courtroom doors be locked during the court's charge to the jury. Were I to reach this claim, I would feel compelled to dismiss it by virtue of the Second Circuit's decision in *United States v. Romano,* 684 F.2d 1057 (2d Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). In *Romano,* the court held:

> The claim that the defendants were deprived of a public trial because the district court locked the courtroom doors while it charged the jury is frivolous. Members of the public were permitted to be and were present within the courtroom during the charge. Locking the door while the charge was read was a reasonable limitation to ensure that the jury was properly instructed without distraction. *See Richmond Newspaper, Inc. v. Virginia,* 448 U.S. 555, 581–82 n. 18, 100 S.Ct. 2814, 2830 n. 18, 65 L.Ed.2d 973 (1980). Indeed, no one even tried to enter the courtroom while the doors were locked.

The holding in *Romano* may deserve reconsideration by the Second Circuit in light of two recent decisions of the Supreme Court. *Waller v. Georgia,* — U.S. —, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). In *Press-Enterprise,* the Court noted that trials are entitled to a "presumption of openness" and held that a trial court could not constitutionally close *voir dire* proceedings to the public. 104 S.Ct. at 824–25. *Press-Enterprise* addressed a First Amendment challenge brought by an organization of the press and did not concern a criminal defendant's Sixth Amendment right to a public trial. Shortly thereafter, however, the Court addressed that Sixth Amendment right in *Waller.* The Court there held that under the Sixth Amendment, any closure of a suppression hearing over the objections of the accused must meet the following tests: the party seeking clo-

sure "must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the hearing, and it must make findings adequate to support the closure." 104 S.Ct. at 2216.

If, as held in *Romano,* the avoidance of any jury distraction justified the closure, may the courtroom be locked to assure that a jury is not distracted during the crucial testimony of a principal witness? And, although in *Romano,* members of the public were permitted to be and were present in the courtroom during the charge, would it matter if the courtroom was empty when the charge began and members of the public were excluded thereafter?

The footnote in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), to which the court made reference in *Romano,* explicitly recognizes that a trial judge may, "in the interest of the fair administration of justice, impose reasonable limitations on access to a trial" just as "a government may impose reasonable time, place and manner restrictions upon the use of the streets in the interest of such objectives as the free flow of traffic." 448 U.S. at 581 n. 18, 100 S.Ct. at 2830 n. 18. The Court went on to say that "'the question in a particular case is whether that control is exercised so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.'" *Id., quoting Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). That view was reasserted in yet another footnote in *Press Enterprise,* 104 S.Ct. at 825 n. 10. Whether the judge's charge to the jury which is, at its best, a lesson in law and in the fundamental prerequisites of a fair trial gives rise to a significant opportunity "for the communication of thought and the discussion of public questions" is at least arguable.