UNITED STATES of America,
Plaintiff-Appellee,

v.

Debbe MARQUARDT,
Defendant-Appellant.

No. 85–1318.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1985.

Decided Feb. 28, 1986.

Robert G. LeBell, Milwaukee, Wis., for defendant-appellant.

R. Jeffrey Wagner, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

The defendant-appellant, Debbe Marquardt, was convicted of willfully misapplying the funds, moneys and credits of a federally insured savings and loan institution in violation of 18 U.S.C. § 657 [1] and of knowingly and willfully making false entries into a book, report or statement of a federally insured savings and loan institution with intent to defraud the institution and deceive its officers, examiners and auditors in violation of 18 U.S.C. § 1006.[2]

---

1. Section 657 provides in pertinent part:
 "Whoever, being an officer, agent or employee of or connected in any capacity with ... [a] savings and loan corporation or association authorized or acting under the laws of the United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... embezzles, abstracts, purloins or willfully misapplies any monies, funds, credits, securities or other things of value belonging to such institution or pledged or otherwise intrusted to its care, shall be fined not more than $5,000 or imprisoned not more than 5 years of both;"
 18 U.S.C. § 657.

2. Section 1006 provides in pertinent part:
 "Whoever, being an officer, agent or employee of or connected in any capacity with [a] savings and loan corporation or association authorized or acting under the laws of the

Marquardt appeals her convictions, her sentence of seven concurrent three-year terms of imprisonment, and the court's denial of her motion for release on bond pending appeal. We affirm.

## I.

A federal grand jury in the Eastern District of Wisconsin returned a seven count indictment against Debbe Marquardt. Count 1 of the indictment charged that on July 14, 1981, Marquardt "did willfully misapply [a First Savings check] payable to First Savings of Wisconsin in the amount of $2,564.71 by using a portion of the proceeds of said check to repay savings account loans on ... an account used for her personal use and the use of others" in violation of 18 U.S.C. § 657. Count 2 charged that on February 20, 1982 Marquardt willfully misapplied $560.25 "by falsely disbursing said funds from First Savings' [bonds redeemed account] and subsequently crediting a portion of said funds to First Savings [vault cash account] and then receiving said funds in cash for her own use or the use of others" in violation of 18 U.S.C. § 657. Count 3 charged that on April 17, 1982, Marquardt "did post a false entry of $2,500 to First Savings [vault cash account], with intent to defraud said institution and to deceive the officers, examiners and auditors of said institution," in violation of 18 U.S.C. § 1006. Count 4 charged that on April 19, 1982, Marquardt posted an unauthorized withdrawal of $2,656.83 to the account of one Beatrice Hermann with the intent to defraud First Savings and deceive its officers in violation of 18 U.S.C. § 1006. Count 5 charged that on December 29, 1982, Marquardt posted a false ledger entry of a $3,093.93 disbursement to First Savings' bonds redeemed account with the intent to defraud the institution and deceive its officers in violation of 18 U.S.C. § 1006. Count 6 charged that on March 7, 1983, Marquardt willfully misapplied $500.00 in Federal Reserve Bond payments by crediting $500.00 to First Savings' vault cash account and subsequently receiving the funds in cash for her own use in violation of 18 U.S.C. § 657. Count 7 charged that on August 2, 1983, Marquardt posted a false entry of $6,200 as a savings account loan debited against the account of one Irene Johnson with the intent to defraud First Savings and deceive its officers in violation of 18 U.S.C. § 1006. Marquardt entered a plea of not guilty and was tried before a jury on the charges contained in the indictment.

The testimony and evidence introduced at Marquardt's trial revealed that in February 1981, Marquardt became the head teller at the Grafton, Wisconsin branch of First Savings Association of Wisconsin ("First Savings"). As head teller, Marquardt supervised the other tellers and was also responsible for handling First Savings' "Bonds Redeemed" account.[3] While an employee

United States or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... with intent to defraud any such institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner or agent of any such institution or of department or agency of the United States, makes any false entry in any book, report or statement of or to any such institution, ... shall be fined not more than $10,000 or imprisoned not more than five years, or both."

18 U.S.C. § 1006.

**3.** A First Savings auditor described the operation of the "bonds redeemed" account as follows:

"If a customer brings a U.S. Savings Bond into the office and wants to cash it, [First Savings] will accept the bond and give the customer the money for it. [First Savings] will then post that to a general ledger account, and at the end of the month all of the bonds that were cashed during the month will be gathered together and [First Savings] will take an adding machine tape of those, agree the total to the general ledger and prepare a form that [First Savings] send[s] to the Federal Reserve Bank requesting that they repay [First Savings] for the bonds that we have redeemed for them.... After we send the check or the request for payment to the Federal Reserve Bank, we will receive a check back from the Fed for the amount we have requested and we will subsequently post that to the general ledger account, bringing that balance down to zero."

of First Savings, but prior to becoming the head teller at the Grafton branch, Marquardt obtained two loans on her mother's savings account at First Savings with her mother's consent.[4] In July 1981, Jim Mews, the manager of the Grafton branch of First Savings, informed Marquardt that interest payments on her savings account loans were overdue as the total outstanding balance of the principal and interest on the loans guaranteed by her mother's account exceeded ninety percent of the amount of her mother's certificate of deposit in violation of the First Savings loan policy. Shortly thereafter, on July 13, 1981, Marquardt prepared a First Savings check in the amount of $2,564.71 drawn on the institution's "bonds redeemed" account[5] without the consent of the savings and loan's authorities. A check drawn on the "bonds redeemed" account would normally be payable to the customer who redeemed the bonds, but the check dated July 13 drawn on the bonds redeemed account was suspect in that it was payable to First Savings rather than to a customer. Furthermore, the evidence established that in fact no bonds had been redeemed on that date. On the same day that Marquardt prepared the check, she transported the same to the Northridge branch of First Savings and misappropriated the funds in that she made a $2,034.69 payment on interest and principal on her two savings account loans secured by her mother's account, deposited $400.00 in her personal savings account, and received $130.02 in cash. These transactions were accomplished without the knowledge or consent of First Savings' authorities.

The evidence and testimony at trial revealed numerous false accounting entries and additional acts of misappropriation of First Savings' funds following Marquardt's initial misappropriation of the $2,564.71 check. Shortly after securing the funds by misapplication of the check, Marquardt prepared a fraudulent "transmittal letter"[6] reciting that $2,564.71 in savings bonds had been redeemed in July of 1981 and sent to the Federal Reserve Bank for reimbursement. An employee of the Federal Reserve Bank testified that the Federal Reserve Bank had no record of having received a transmittal letter from First Savings for redeemed bonds in the amount of $2,564.71, and an audit of First Savings' records[7] revealed that the institution had not received a check in the amount of

4. A savings account loan is a service offered to First Savings customers who have a certificate of deposit or a savings account and need cash, but do not want to withdraw money from their account. The service is especially relevant to customers with certificates of deposit because a withdrawal of the certificate before the maturity date will result in a substantial penalty assessed against the account. First Savings offers the customer a loan against the account, with the passbook or certificate as collateral, with the loan term generally being one year. At the end of the loan term, the customer can either renew the loan or pay it off.

5. A check drawn on the bonds redeemed account generally reflects that a customer has redeemed United States savings bonds and that First Savings paid the customer for the bonds.

6. A transmittal letter is a request for payment from the Federal Reserve Bank for U.S. Savings Bonds redeemed at First Savings. According to First Savings procedure, between the first and fifteenth of the month, Marquardt was to total the amount paid out by the Grafton branch for bonds redeemed during the preceding month. (Redeemed bonds were placed in the vault until a transmittal letter was prepared.) She was then to prepare a transmittal letter on a form provided by the Federal Reserve, indicating the month the bonds were redeemed, the number of bonds, and the total amount of funds paid out by First Savings for redeemed bonds. First Savings retained a copy of the transmittal letter, and sent the original, together with the bonds to the Federal Reserve Bank.

7. After First Savings discovered an unauthorized savings account loan through a routine audit in January 1984, Mary Anderson, a First Savings auditor, conducted a further audit of the Grafton branch. Anderson testified that for the years 1981 through 1983 she reviewed all the ledger entries for the bonds redeemed account, examined copies of the transmittal letters requesting reimbursement for redeemed bonds that were sent to the Federal Reserve Bank for each month, and also reviewed First Savings records in the hope of ascertaining whether First Savings received credits or assets from the Federal Reserve to offset the amount of bonds redeemed for each month.

$2,564.71 from the Federal Reserve Bank as payment for the bonds in question.

Several months later, on February 20, 1982, Marquardt removed $500.00 from the vault cash account and thereafter prepared a ledger entry reciting that she paid out $560.25 in cash to a customer (fictitious person) who allegedly redeemed savings bonds in that amount on that date, but instead Marquardt misapplied the $560.25 to her own use. The auditor's review of First Savings' records failed to uncover any document or record evidencing the redemption of bonds in that amount on that date or that a transmittal letter was either prepared or sent to the Federal Reserve Bank for reimbursement on the bonds in the amount of $560.25. Further checking revealed that First Savings had not received a $560.25 reimbursement for the allegedly redeemed bonds from the Federal Reserve Bank.

The auditor's review further disclosed that two months later, on April 17, 1982, Marquardt prepared another fictitious ledger entry to conceal her initial misappropriation of a First Savings check on July 13, 1981 reflecting the receipt of $2,563.61 from the Federal Reserve Bank for the bonds allegedly redeemed on that date. According to the auditor, First Savings' records failed to disclose receipt of a check from the Federal Reserve Bank in that amount on that date or at any other time. The evidence also established that shortly thereafter on the same day, Marquardt prepared a false ledger entry reciting that she transferred $2,500 from her cash drawer to the vault cash account. The transfer of $2,500, which was in fact applied to the bonds redeemed account, together with the false ledger entry reciting the receipt of $2,563.61 from the Federal Reserve Bank balanced the bonds redeemed account and temporarily concealed her misapplication of the $2,564.71 check on July 13, 1981, but left the vault cash account $2,500 short.

Two days later on April 19, 1982, Marquardt closed out the savings account of an ailing customer named Beatrice Hermann and transferred the money in her account ($2,656.83) to the vault cash account without the knowledge or consent of either Hermann or First Savings. Marquardt marked the withdrawal slip "deceased"— "per legal file," reflecting that probate papers concerning the allegedly deceased account holder were on file at First Savings. Beatrice Hermann was not deceased as of April 19, and thus Hermann's First Savings' file did not and could not properly reflect any probate proceedings. With the closing out of the Hermann account and the transfer of its funds to the vault cash account, Marquardt balanced the vault cash account and her cash drawer (which had been $2,500 short following Marquardt's false entry on April 17), thus concealing her April 17 false ledger entry.

Several months later, in November 1982, Beatrice Hermann died, and on December 29 her personal representative (her brother) attempted to close out her account at First Savings. At this time, Marquardt reopened the account, redeposited $2,656.83 in the account, manually credited the account with the interest due from April to December 1982, and paid out the total amount to Hermann's brother. In an attempt to cover-up the $2,656.83 shortage resulting from the redeposit to the Hermann account, Marquardt posted a ledger entry to the bond's redeemed account showing that a customer had cashed $3,093.93 worth of savings bonds on that date. This entry of $3,093.93 also proved to be fraudulent as the First Savings audit revealed no record of a transmittal letter prepared or sent to the Federal Reserve Bank for bonds in that amount nor did the audit reveal any record of the receipt of payment from the Federal Reserve Bank for bonds in that amount.

On March 7, 1983, First Savings received three checks from the Federal Reserve Bank totaling $7,996.69 as reimbursement for various savings bonds which had previously been submitted to the Federal Reserve Bank. Marquardt credited $7,496.69 to the bonds redeemed account and withdrew the remaining $500.00 from the vault

cash account in cash and misappropriated the $500.00 for her own use.

Finally, on August 2, 1983, Marquardt prepared a First Savings check in the amount of $6,200.00 payable to First Savings drawn as a savings account loan secured by the account of one Irene Johnson, without Johnson's permission or knowledge. On the same date, Marquardt credited the bonds redeemed account with $6,193.27, reflecting the receipt of checks totaling that amount from the Federal Reserve Bank as reimbursement for bonds previously redeemed and submitted to the Federal Reserve Bank, while the First Savings' audit revealed that in fact no payment was received from the Federal Reserve Bank on that account on that date. Further, the auditor's calculations established that the $6,193.27 credited to the bonds redeemed account on August 2 balanced to within $.49 of the total of the various false entries traceable to Marquardt since July 1981. When First Savings' officials confronted Marquardt with the $6,200 loan allegedly secured by the Johnson account, she acknowledged she had processed the loan without the customer's knowledge or consent and credited the proceeds to the bonds redeemed account.

Marquardt denied at trial ever having misappropriated any First Savings funds for her own use. Explaining the July 13, 1981 transaction, Marquardt testified that she personally redeemed $2,564.71 in savings bonds received as a gift from her grandfather. She acknowledged that she prepared the false August 2, 1983 loan debited against the Irene Johnson account, but claimed that the loan transaction, along with several other false entries regarding the bonds redeemed account, were made to cover the theft of a money bag containing $6,200.00 from First Savings' premises, supposedly stolen while entrusted to her care in August 1982. She also testified that she originally had kept records of the false entries she made to cover the alleged "stolen money bag," but disposed of the records before her deception was uncovered. Other than Marquardt's unsupported testimony, no one at First Savings

had any knowledge of the theft of a money bag containing $6,200.00 from First Savings. Finally, Marquardt testified on cross-examination that it was pure coincidence that the amount in the allegedly "stolen" money bag matched the amount of the total false entries to the bonds redeemed account within $.49.

The jury returned verdicts of guilty on all seven counts charged in the indictment, and the district court accepted the jury's findings and sentenced Marquardt to seven concurrent three year terms of imprisonment and ordered her to pay restitution in the sum of $6,193.27. At the sentencing hearing, the district court denied Marquardt's motion for release on bond pending appeal.

Marquardt raises several issues on appeal. She contends that: (1) the court erred in denying her motion for acquittal or dismissal on the grounds that the seven counts of the indictment were multiplicitous; (2) the court erred in denying her motion for dismissal or acquittal on the grounds that the indictment charged misapplication of funds while the allegations, if believed, support a charge of embezzlement; (3) the court erred in denying her Rule 29 motion, arguing that there was insufficient evidence to support the jury's verdict; (4) the court abused its discretion in imposing seven concurrent three year sentences; (5) the court erred in refusing her request for bond pending appeal; and (6) the court erred in refusing to give her requested jury instructions.

## II.

### A. Multiplicity

Marquardt argues that "the allegations in counts 1, 2 and 6 demonstrate a singular purpose and not three specific acts of theft," and thus "were part of a course of proscribed conduct punishable as one criminal event." She further argues, "[A]ssuming arguendo that the government was able to prove three distinct acts of embezzlement in counts 1, 2 and 6, all other acts would not be attempts by the defendant to

deprive the bank of its funds, but, rather collateral attempts at effectuating the specific intent in counts 1, 2 and 6. Counts 3, 4, 5, and 7 would be multiplicitous or merely merged into the proof of Counts 1, 2, and 6." Marquardt also contends that the purported unauthorized posting of $6,200 in count 7 "did not result in an additional net loss of $6,200 to the bank" for it was only a transfer from an individual customer's account to the central internal bank account. Marquardt thus contends that the transaction alleged in count 7 is not a separate crime from the conduct charged in counts 1 through 6, but is multiplicitous.

■ "Multiplicity consists of charging the same defendant with the same offense in several different counts." *United States v. Bartemio*, 547 F.2d 341, 345 (7th Cir.), *cert. denied*, 419 U.S. 994, 95 S.Ct. 305, 42 L.Ed.2d 266 (1974). Courts have found that when an indictment is multiplicitous, "[I]t may prejudice the jury against the defendant by creating the impression of more criminal activity on his part than in fact may have been present." *United States v. Carter*, 576 F.2d 1061, 1064 (3rd Cir.1978); *see also United States v. Gullett*, 713 F.2d 1203, 1211–12 (6th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984). The traditional test of multiplicity "determines whether each count 'requires proof of a fact which the other does not.'" *United States v. Kennedy*, 726 F.2d 546, 547–48 (9th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984) (quoting *United States v. Glanton*, 707 F.2d 1238 (11th Cir.1983)). "If one element is required to prove the offense in one count which is not required to prove the offense in the second count, there is no multiplicity." *United States v. Briscoe*, 742 F.2d 842, 845 (5th Cir.1984).

### 1. Misapplication of Funds, Counts 1, 2, and 6

■ In the case at bar count 1 charged that on July 14, 1981, Marquardt misapplied a First Savings check in the amount of $2,564.71; count 2 charged that on February 20, 1982 Marquardt falsely disbursed $560.25 from First Savings bonds redeemed account and received that sum in cash; and Count 6 charged that on March 7, 1983 Marquardt misapplied $500.00 in Federal Reserve Bank payments and received that sum in cash. Each count charging misapplication of funds thus involved a different date, a different method of misapplication (misapplying a First Savings check, making a false disbursement from the bonds redeemed account, and personally taking funds received by First Savings rather than crediting the funds to the bonds redeemed account) and a different sum. Consequently, conviction on each count charging misapplication of First Savings' funds (1, 2 and 6) required proof of separate and distinct facts (date, sum, and method of misapplication). Thus, we conclude that counts 1, 2 and 6 state the separate offenses and are not multiplicitous.

### 2. False Entries, Counts 3, 4, 5, and 7

■ The crime of willful misapplication of funds under § 657 is entirely separate and distinct from the crime of making false entries in the records of a savings and loan under § 1006. The prosecution is not required to prove willful misapplication of funds in order to establish a charge of false entry, nor is the making of a false entry necessary for conviction on a charge of willful misappropriation of bank funds. *Compare* 18 U.S.C. § 657 and *United States v. Tidwell*, 559 F.2d 262, 265 (5th Cir.1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978) (discussing elements of misapplication of bank funds pursuant to 18 U.S.C. § 656, a parallel provision of § 657 applying to national banks, members of the Federal Reserve banks, or banks insured by the Federal Deposit Insurance Corporation rather than savings and loan associations) with 18 U.S.C. § 1006 and *United States v. Frederick*, 551 F.Supp. 1035, 1042 (D.Kan.1982) (discussing elements of false entry pursuant to 18 U.S.C. § 1005, a parallel provision of § 1006 applying to national banks, member banks of the Federal Reserve, and banks insured by the FDIC rather than

savings and loans). Accordingly, as the crime of false entry requires proof of an element (a false entry) not necessary to prove willful misapplication of funds, counts 3, 4, 5, and 7 (charging false entries) state offenses separate from the charges of willful misapplication of First Savings' funds contained in counts 1, 2, and 6 and are not multiplicitous.[8] Individuals are criminally responsible for each and every criminal act they commit and thus Marquardt may properly be charged and punished for each act of misappropriating First Savings' funds and each false entry she made in the institution's books with the intent to defraud the institution as each count of her indictment stated a separate and distinct criminal act requiring proof of a fact that the other counts did not.

### B. Mischarging of Conduct

In Marquardt's next argument, she seems to contend that the entries alleged in counts 3, 4, 5 and 7 "were recorded exactly as they transpired" and she avers that this court's decision in *United States v. Erickson*, 601 F.2d 296 (7th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979), "precludes the charging of and finding of guilt for the entry of false transactions if they were recorded exactly as they occurred."

█ In Marquardt's attempt to exonerate herself under *Erickson*, she cleverly misapplies and misinterprets the evidence to her own advantage. Contrary to Marquardt's assertion, a review of the record reveals that the entries alleged in counts 3, 4, 5, and 7 were not "recorded exactly as they transpired." Count 3 of the indictment charged Marquardt with posting a false entry of $2,500 to First Savings' vault cash account on April 17, 1982. The evidence introduced established that Marquardt made a ledger entry reciting that $2,500 was transferred from her cash

drawer to the vault cash account to temporarily conceal her misappropriation of a $2,564.71 check on July 13, 1981, but the jury found that the $2,500 was applied to the bonds redeemed account rather than the vault cash account, and thus the entry reflecting a transfer to the vault cash account obviously was false. Counts 4 and 7 charged Marquardt with making entries recording unauthorized transactions involving the savings accounts of customers without the knowledge or consent of the customer or the institution. Since the evidence established that neither the withdrawal from the account of Beatrice Hermann nor the savings account loan allegedly debited against the account of Irene Johnson were authorized by Hermann or Johnson respectively, the recorded transactions were fictitious and thus were false within the meaning of 18 U.S.C. § 1006. Finally, count 5 of the indictment charged Marquardt with posting a false ledger entry of $3,093.93 to the bonds redeemed account on December 29, 1982, reflecting that a customer redeemed bonds in that amount when in fact no bonds were redeemed, no transmittal letter to the Federal Reserve Bank was prepared for bonds allegedly redeemed in that amount on that day and no payment was received for bonds in that amount from the Federal Reserve Bank; thus, Marquardt's ledger entry reflecting this redemption was clearly false and was intended to deceive First Savings officers and auditors.

█ Marquardt further contends that the court erred in refusing to grant her judgment of acquittal on the grounds that the indictment charged Marquardt with misapplication of bank funds while the allegations contained in the indictment constitute embezzlement and concludes that her motion for acquittal "should have been granted on the grounds that the indictment

---

**8.** Contrary to Marquardt's contention, it is immaterial whether the false entry charged in count 7 resulted in a net loss to First Savings. A violation of § 1006 does not require proof that the bank sustained a monetary loss, but rather that the person making the false entry acted with "intent to defraud [the] institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner, or agent of [the] institution...." 18 U.S.C. § 1006.

was erroneously charged." " 'Embezzlement' is the willful taking of an insured bank's money by its employee, after the money has lawfully come within the control of the person taking it, with intent to defraud the bank, while 'misapplication' is simply the willful taking of an insured bank's money by its employee with intent to defraud the bank." *United States v. Acosta*, 748 F.2d 577, 580 (11th Cir.1984). Thus, "[m]isapplication, unlike embezzlement, does not require previous lawful possession of the funds." *United States v. Hazeem*, 679 F.2d 770, 772 (9th Cir.), *cert. denied*, 459 U.S. 848, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982). In the present case, Marquardt had lawful control of First Savings' funds only within the limited authority granted her by virtue of her position as head teller at the institution. Embezzlement requires all the elements of misapplication plus previous lawful possession of the funds, and thus "any proof sufficient to support embezzlement necessarily is sufficient to support misapplication." *Acosta*, 748 F.2d at 580. The government's evidence, although it might also support a charge of embezzlement, clearly establishes the misapplication of savings and loan funds, and the district court properly denied Marquardt's motion for acquittal on the grounds that the indictment was erroneously charged.

### C. Sufficiency of the Evidence

Marquardt moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29 at the close of the Government's case and then at the conclusion of her defense, arguing that the evidence was circumstantial and provided no direct proof that the defendant committed the crimes alleged. Marquardt now maintains that "the court erred in denying [her] motions for acquittal and as a corollary that Due Process necessitates dismissal on appeal in that there is insufficient evidence to support the jury's verdict."

 In reviewing a ruling on a motion for acquittal,

"[T]he test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government ... bear[ing] in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences.' "

*United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980) (quoting *United States v. Blasco*, 581 F.2d 681, 684 (7th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978)). "The inference of a defendant's guilt of a criminal offense may be created either by direct evidence or by circumstantial evidence and circumstantial evidence is of equal probative value to direct evidence." *United States v. Towers*, 775 F.2d 184, 188 (7th Cir.1985). Indeed, circumstantial evidence "may be the sole support for a conviction." *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir. 1985). A review of the record reveals that the government introduced the testimony of a First Savings auditor, Mary Anderson, who established the foundation for the more than 45 exhibits documenting each and every misapplication of funds and each and every false entry charged in the indictment. Furthermore, the auditor testified that she examined the records of the Grafton, Wisconsin branch of First Savings and explained that she could find no transmittal letters to support Marquardt's February 20, 1982, and December 29, 1982, ledger entries in the bonds redeemed account nor could she find records of reimbursement payments received from the Federal Reserve Bank for ledger entries Marquardt posted to the bonds redeemed account on April 17, 1982 and August 2, 1983. Further, Marquardt admitted to making false entries to cover-up an alleged "theft" of a money bag containing $6,200 in August 1982. Marquardt attempted to explain away the government's documentary evidence by presenting an undocumented, unsupported story of receiving bonds as a gift from her grandfather and the "theft" of the money bag. After hearing the evi-

dence presented by both sides, the jury determined that Marquardt's attempted explanation was not plausible in view of the overwhelming circumstantial and documentary evidence the government presented establishing that Marquardt repeatedly misappropriated funds from First Savings and made false entries in the institution's records. The record contains more than sufficient evidence to support the jury's verdict of guilty on all seven counts in the indictment, three charging Marquardt with the misappropriation of First Savings' funds and the four concerning her false entries in the institution's records, and we hold the trial court properly denied Marquardt's motion for acquittal.

### D. Marquardt's Sentence

Marquardt maintains that when the district court sentenced her, "the court relied heavily if not entirely upon the court's failure to believe [Marquardt] and her apparent perjurious testimony." According to Marquardt, "the trial court clearly abused its discretion in relying upon allegedly perjurious testimony to the exclusion of other relevant factors."

"[A] district court has wide discretion in determining what sentence to impose," *United States v. McCoy*, 770 F.2d 647, 648 (7th Cir.1985), and in deciding what sentence is appropriate, "[t]he weight to be given various factors is [also] within the discretion of the sentencing court." *United States v. Wilkins*, 659 F.2d 769, 773 (7th Cir.1981). "[A] trial court and the trial judge may consider [the defendant's truthfulness] in determining the sentence to be imposed and may enhance the defendant's sentence if he believes that the defendant testified falsely." *Harris*, 761 F.2d 394, 403-04 (7th Cir.1985). Although a trial court may properly consider a defendant's perceived perjury when determining an appropriate sentence, a review of the record in the present case reveals that the trial judge considered more than Marquardt's apparent perjurious testimony when imposing sentence; in explaining his intent in sentencing Marquardt, the judge stated:

"She wouldn't be there [standing before the court to receive sentence] but for greed. The other side of the coin is that it was a very calculated offense. The jury didn't believe her story, in fact I think her story is literally not capable of belief, as one gets into the details of the case.... I certainly agree with defense counsel, no one should be penalized for putting the government to trial. That's an inalienable right. I am a little disappointed that Debbe doesn't seem to recognize her offense at this stage. It certainly is her right to maintain her innocence. I just can't believe it. And, of course, this is not an isolated event that occurred one time where her resistance was broken down by greed, but it was a long term thing, very cleverly concealed. It was an abuse of trust.... Society has a need to punish those who break its laws.... Sometimes we have to put people away in order to protect the rest of us.... Sometimes we hope our invented [devices] for handling violations of the law ... will reform a person and create a character or traits of character that may not have existed previously. And then finally there is an impact that disposition may have on the general populace. The theory that if somebody knows they are going to be punished if they break the law, then they won't break the law.

I don't think that Debbe really has to be put away in order to protect the rest of us from her. She's not, as has been pointed out, this is not a crime of violence. I am not sure about rehabilitation. I am troubled by what seems to be the calculated nature of this offense, but the surface aspects of her life would lead one to say she really doesn't need rehabilitation. So I guess there's a little bit of flavor there that we have to pay attention to, I don't know how much. So that leaves me then with retribution, and general deterrence as the purposes of which I'd be attempting to [serve]. And I think without any question that the most important one in this case is general [deter-

rence]. This is not the only savings and loan embezzlement that's been through court lately."

The record reveals that the district court carefully considered more than 10 relevant factors—including Marquardt's greed, the calculated nature of her offense, the fact that her story was not capable of belief, her refusal to recognize her offense, the fact that it was not an isolated one time offense, the cleverly concealed nature of her offenses, her abuse of trust, society's need to punish those who break its laws, the necessity of putting people away to protect the rest of society, and the need for rehabilitation, retribution and general deterrence—in determining the appropriate sentence for Marquardt, and we hold that the district court did not abuse its discretion in sentencing Marquardt to seven concurrent three-year terms of incarceration.

### E. Jury Instructions

 Marquardt requested that several additions be made to the jury instructions adopted by the court, but the court declined to give the requested instructions. The record reflects that Marquardt did not object to the court's refusal to give her requested instructions before the jury retired for deliberations as required by Rule 30 of the Federal Rules of Criminal Procedure.[9] Initially we must determine whether Marquardt has preserved the issue of her proposed jury instructions for appeal.

"As we have previously held, a trial court's refusal to give a party's proposed instruction does not by itself satisfy the requirements of rule 30 if the party takes no further action.

The mere offer of the instruction does not preserve the error for appeal. If the party whose tendered instruction is refused fails to object to the refusal, stating distinctly the grounds of his objection, the Court of Appeals may review the refusal to instruct only to determine whether it constituted plain

error within the meaning of Fed.R. Crim.P. 52(b).

United States v. Gratton, 525 F.2d 1161, 1163 (7th Cir.1975). The rationale underlying the requirement of a distinct statement of objection is, of course, to draw the attention of the trial court to the alleged error at a time when the court is able to rectify the error. United States v. Jackson, 569 F.2d 1003, 1009 (7th Cir. 1978)."

United States v. Kuecker, 740 F.2d 496, 503 (7th Cir.1984). Since Marquardt failed to object she has not preserved her claim that the trial court erred in refusing to give her requested instructions. Thus, our review is limited to determining whether the trial court's failure to give Marquardt's requested instructions constitutes "plain error." Fed.R.Crim.P. 52(b); United States v. Green, 779 F.2d 1313, 1319 n. 6 (7th Cir.1985); Kuecker, 740 F.2d at 503; Jackson, 569 F.2d at 1010. As we have previously stated, " '[I]n deciding whether a defect in a jury instruction is "plain error," we must examine the entire record before us, and determine whether the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' " United States v. Torres, 733 F.2d 449, 458 (7th Cir.), cert. denied, —— U.S. ——, 105 S.Ct. 204, 83 L.Ed.2d 135 (1984) (quoting Jackson, 569 F.2d at 1010).

Marquardt argues that the court erred in refusing to give an instruction that "character witnesses, if believed, are sufficient to create a reasonable doubt." The court declined to give the requested instruction and instructed the jury inter alia, "You should consider all the evidence in the case in determining the credibility of the witnesses." Marquardt contends on appeal that the court's failure "to give any character instruction including or excluding the fact that such testimony in and of itself creates reasonable doubt ... created plain error and necessitates reversal."

---

**9.** Rule 30 provides in pertinent part:
"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to con-

sider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."
Fed.R.Crim.P. 30.

In *United States v. Burke*, 781 F.2d 1234 (7th Cir.1985), this court recently found no error in the trial court's refusal to instruct the jury that "[c]haracter evidence alone may create a reasonable doubt of the defendant's guilt." The defendant in *Burke* presented ten character witnesses and testified himself. Rather than give the requested instruction concerning character evidence "standing alone," the court instructed the jury, "Character evidence may be considered by you in determining whether the Government has proven the defendant's guilt beyond a reasonable doubt." We held the district judge properly declined to give the standing alone instruction, reasoning that:

"A 'standing alone' instruction invites attention to a single bit of evidence and suggests to jurors that they analyze this evidence all by itself. No instruction flags any other evidence for this analysis—not eyewitness evidence, not physical evidence, not even confessions. There is no good reason to consider any evidence 'standing alone.'"

*Id.* at 1239. Our decision in *Burke* overruled *United States v. Donnelly*, 179 F.2d 227 (7th Cir.1950), in which this court found reversible error in the trial court's failure "to instruct the jury that character evidence may in itself be sufficient to create in the minds of the jury a reasonable doubt as to the guilt of the defendant" where the "outcome of the case depended largely upon the jury's appraisal of the credibility of [an accomplice] and of the defendant." 179 F.2d at 233. In support of its holding, the court in *Donnelly* quoted from *Edgington v. United States*, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896):

"Whatever may have been said in some of the earlier cases, to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although, without it, the other evidence would be convincing."

*Id.* at 366, 17 S.Ct. at 73. In *Burke*, we reexamined the Supreme Court decision in *Edgington* and concluded that passage from *Edgington* quoted in *Donnelly* "does not support an instruction that singles out character evidence.... The point of the passage—that character evidence when taken with other evidence may create a reasonable doubt—assimilates character evidence to other kinds of evidence." *Burke*, at 1240–41. We further stated in *Burke*:

"*Edgington* did not suggest that the instruction should *say* that character evidence be considered in a special way by the jury; to the contrary it quoted at length from and cited cases holding that character evidence should simply be considered with other evidence. *Edgington* told the federal courts to eliminate differences in the treatment of character and other evidence, not to create new differences."

*Id.* at 1241 (emphasis in original). Accordingly, Marquardt is incorrect in stating that character evidence "should be highlighted in the final instructions to the jury [and] should be treated differently than other evidence in the case." As the court in Burke recognized that the "standing alone" instruction could mislead the jury, the trial court properly refused to give an instruction that "character witnesses, if believed, are sufficient to create a reasonable doubt."

Although we rejected the requirement of a "standing alone" instruction in *Burke*, we also acknowledged that the court:

"should tell the jurors that they may use reputation evidence to help evaluate the truthfulness of the defendant's testimony and to help evaluate the credibility of the innocent explanation he offers for his acts.... (We do not decide, however, that an instruction addressing character

evidence in particular is essential in every case. Some cases are concerned more with documents than credibility, and in these it may be unnecessary to give any special instruction.)"

*Id.* at 1240. In the case at bar, the court's instruction did not specifically mention character evidence; the court instructed the jury "to consider all the evidence in the case in determining the credibility of the witnesses." In the context of this case, in which Marquardt's guilt did not hinge on credibility assessments, but was established by overwhelming documentary evidence (some 45 exhibits) that Marquardt willfully misapplied First Savings' funds and knowingly and intentionally made false entries in First Savings' records on seven different occasions as charged in the indictment, the court's instruction "to consider all the evidence in determining the credibility of the witnesses" was sufficient and proper and the court's failure to specifically instruct the jury regarding character evidence was not error. Furthermore, assuming arguendo that the court's failure to so instruct the jury was erroneous, we fail to understand how the giving of the requested instruction would have had a "probable impact" on the jury's finding that Marquardt is guilty. In view of the overwhelming amount of evidence presented by the government, we are convinced beyond doubt that the giving of an additional instruction specifically addressing character evidence would not have affected the jury's verdict. Accordingly, the court's failure to instruct the jury regarding character evidence was not plain error.

■ Marquardt also claims that the court erred in failing to give an instruction defining reasonable doubt. Marquardt's claim is without merit. "We have repeatedly admonished district courts not to define 'reasonable doubt.' *See, e.g., United States v. Allen,* 596 F.2d 227, 230 (7th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 97 (1979); *United States v. Lawson,* 507 F.2d 433, 442 (7th Cir.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). We advise against defining 'reasonable doubt' because often

the definition engenders more confusion than does the term itself." *United States v. Martin-Trigona,* 684 F.2d 485, 493 (7th Cir.1982). Further, we have specifically held that the failure to give an instruction defining reasonable doubt is not reversible error. "[T]he failure to give a defining instruction of 'beyond a reasonable doubt,' even though an acceptable instruction has been tendered, should not be the basis for reversing an otherwise fairly conducted trial." *Lawson,* 507 F.2d at 441; *see also United States v. Larson,* 581 F.2d 664, 669 (7th Cir.1978). The trial court instructed the jury that "the government has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains squarely on the government throughout the case." The court's failure to supplement its instructions with a definition of reasonable doubt was not error.

Marquardt also takes issue with the court's refusal to make additions to the court's instructions regarding the crimes of willful misapplication of funds and knowingly making false entries. According to Marquardt's brief, she requested:

"the following addition to the standard instruction of 18 U.S.C. § 657:

'1. That the burden is upon the government to establish beyond a reasonable doubt that, not only were the entries false and that the defendant made them, but that she had knowledge of their facility and thereby intended to injure or deceive the bank. (Tr. 473) *Brickley [Brickey] v. United States,* 123 F.2d 341 (8th Cir.1941); and

'2. The term "willful misapplication" means a criminal misapplication rather than a mere act of maladministration. In order for there to be willful misapplication, the defendant must convert to his own use, benefit or gain or to some other person or company's use benefit or gain, the monies, funds or credits of the bank. It is not even such authorized or unlawful appropriations of monies,

funds or credits which is illegal, but only those acts willfully done with specific intent to defraud and deceive the bank.' (Tr. 473) *United States v. Kernodle*, 367 F.Supp. 844, 850 (1973) (N.C., D.C.)"

The first portion of this suggested addition to the standard instruction for violation of 18 U.S.C. § 657 (willful misapplication of funds) is limited to a discussion of the government's burden of proof in establishing false entries. As noted above, proof of a false entry is unnecessary to establish a violation of § 657 as a false entry is not an element of the crime of misappropriating savings and loan funds, 18 U.S.C. § 657; *see also United States v. Tidwell*, 559 F.2d 262, 265 (the four essential elements of a violation of 18 U.S.C. § 656 (a parallel provision to § 657 applying to banks rather than savings and loans) are: "(1) that the accused was an officer ... of a bank, (2) that the bank was connected in some way with a nationally or federally insured bank, (3) that the accused wilfully misapplied the money ... of said bank, and (4) that the accused acted with intent to injure and defraud said bank."), and thus there is no merit in Marquardt's contention that the court's failure to add the requested language was error.

■ With respect to the second half of Marquardt's requested addition to the standard instruction for 18 U.S.C. § 657, we note that the court's instruction provided:

"To misapply means something more than irregular or negligent use of a savings and loan association's funds or funds entrusted to the savings and loan association. It means the unlawful taking or conversion of monies, funds or credits of the association or entrusted to the association by association officers or employees for his or her own benefit or for the use and benefit of some other person done willfully and with specific intent to injure or defraud the bank."

We fail to understand how the second portion of Marquardt's requested addition to the instructions would have substantially altered the instructions the jury received as

Marquardt's instruction merely rephrases the content of the court's instruction set forth above. "The instructions are to be viewed as a whole, and the exact wording of an instruction is left to the discretion of the trial court. The court need not give a proposed instruction if the essential points are covered by those that are given." *United States v. Xheka*, 704 F.2d 974, 987 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (citations omitted). "Where the jury is fully and fairly instructed upon the case as a whole it is unnecessary to give any specific instruction in the precise form requested by the defendant." *Green*, 779 F.2d at 1320 (quoting *United States v. Pritchard*, 458 F.2d 1036, 1040 (7th Cir.), *cert. denied*, 407 U.S. 911, 92 S.Ct. 2434, 32 L.Ed.2d 685 (1972)). As the court's instruction fully covered the essential points raised in Marquardt's suggested addition, the court's refusal to give the requested addition was not error.

■ Finally, Marquardt requested that the court give the following instruction regarding counts 3, 4, 5 and 7 (charging false entries): "Although entries recording fictitious transactions or accurately recording actual transactions are false within the meaning of the False Banking Entry Act, an entry recording an actual transaction on a bank's books exactly as it occurred is not a false entry under that statute even though it is part of a fraudulent or otherwise illegal scheme." (quoting *United States v. Erickson*, 601 F.2d 296, 297 (7th Cir.1979)). With respect to counts 3, 4, 5 and 7, the court instructed the jury:

"Now, an entry in a book or record is false if it is untrue and is known to be untrue by the person making it or causing it to be made.

An entry may be false if it records a transaction which did not occur, or fails to record or include any transaction which did occur to, or inaccurately report on records a transaction. (sic)"

We again fail to understand how this additional language regarding false entries would have significantly altered the sub-

stance of the instructions given by the court as the court's instructions fully defined the term "false entry". We reiterate, "[w]here the jury is fully and fairly instructed upon the case as a whole it is unnecessary to give any specific instruction in the precise form requested by the defendant." *Green*, 779 F.2d at 1320. The instruction given by the court in this case fully covered the definition of a false entry, and we hold that the court's failure to give Marquardt's requested addition to the court's instruction was not error.

### F. Release on Bond Pending Appeal

 Marquardt appeals the district court's denial of her motion for release on bond pending appeal arguing that a convicted defendant must be released on bond pending appeal if the court determined "there exists a fairly debatable argument of the type that calls into question the validity of the judgment." Marquardt's br. at 24. It was within our power to release her pending the appeal and we would have considered releasing her pending appeal if the statutory criteria of 18 U.S.C. § 3143 had been met. A defendant's release on bond pending appeal is governed by 18 U.S.C. § 3143(b), providing in part:

"The judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

(1) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released pursuant to section 3142(b) and (c); and

(2) that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial."

We did not reach the bail issue during the consideration of this case since the issues raised in this appeal were not substantial for purposes of granting bail.

### III.

The decision of the district court is AFFIRMED.