**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles T. PIEPER,
Defendant–Appellant.**

No. 87–1589.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 1, 1987.

Decided Aug. 12, 1988.

---

William M. Coffey, Coffey, Coffey & Geraghty, Milwaukee, Wis., for defendant-appellant.

Stephen J. Liccione, Asst. U.S. Atty., Patricia A. Gorence, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD, Jr. and CUDAHY, Circuit Judges, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

A jury found Charles T. Pieper, formerly the Chief Executive of Local 344 of the Teamsters Union and its related health and pension funds, guilty of soliciting and accepting kickbacks, fees, and commissions to influence an employee benefit plan in violation of 18 U.S.C. § 1954; filing false income tax returns in violation of 26 U.S.C. § 7206(1); conspiring both (1) to solicit kickbacks, fees and commissions as part of a scheme to influence an employee benefit plan and (2) to defraud the government by obstructing the assessment of income tax in violation of 18 U.S.C. § 371; and conducting the affairs of an employee benefit pension fund through a pattern of racketeering activity in violation of §§ 1962(c) and 1963 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

On appeal, Pieper raises a medley of challenges to his conviction: (1) the § 1954 does not apply to his conduct, and that in any event, the evidence was insufficient to support a conviction under § 1954; (2) that the evidence was insufficient to support a conviction under the RICO count; and (3) that the district court erred by refusing to dismiss seven of the twenty-six counts of the indictment on grounds of "multiplicity." Additionally, Pieper contends that the district court abused its discretion in assessing him certain costs of prosecution, including jury costs, transcription fees, and travel and per diem expenses for government witnesses. We reject Pieper's RICO, § 1954, and multiplicity claims and affirm his conviction. However, we reverse the district judge's decision to assess Pieper

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, sitting by designation.

the costs of court reporter fees for daily transcripts.

## I.

Charles T. Pieper served as Secretary Treasurer of Teamsters Local 344 from 1973 through November 1982, and as a trustee and Chairman of the Board of Trustees of the Milwaukee Drivers Pension Trust Fund (the "Fund") from before July 1, 1981, until November 30, 1982. In early May 1981, the Fund's board of trustees delegated all of its investment authority to an Executive Committee consisting of Pieper and one other trustee, Robert Trapp. Shortly thereafter, Pieper suggested that the Fund's assets be transferred from First Wisconsin National Bank to the Marsahll and Ilsley Bank ("M & I") and that M & I be made the investment agent for the Fund. On May 22, 1981, the Fund's assets were transferred to M & I pursuant to two Custodial Agreements. The Custodial Agreements essentially provided that M & I was to execute real estate mortgage loans within the Fund's guidelines and that the bank was not to exercise discretion in making investments. Samuel Lincoln was designated as trust officer in charge of the fund account.

During this period, Gary Landru was a vice president at M & I Northern Bank. Landru and Pieper had known each other for several years, and Landru, in addition to his duties as account officer for the business accounts of Teamsters Local 344, was in charge of Pieper's personal accounts.

Shortly after the board transferred the Fund's assets to M & I, Pieper and Landru devised a scheme whereby Landru would screen applicants for mortgage money from the Fund and exact from borrowers a three percent kickback which he would then share equally with Pieper. To effectuate this scheme, Pieper directed Samuel Lincoln, the trust officer in charge of the account and an unknowing participant, to execute mortgage loans upon Landru's instructions.

During July 1981, Landru solicited two loan mortgage commitments: a $280,000 commercial mortgage to Bruch Brothers, a building contractor firm; and a $92,000 mortgage to Mr. and Mrs. Dale Bluvstein. The Bruch Brothers loan closed on August 13, 1981; the Bluvstein loan never closed. In exchange for the commitments, Landru received from George Bruch a kickback of $8,400, which represented three percent of the face amount of the loan, and $2,760 from the Bluvsteins. Landru split these kickbacks with Pieper.

On August 20, 1981, the Fund's board of trustees passed a resolution rescinding its earlier decision to delegate to the Executive Committee the responsibility for the investment of the Fund's assets. The board took this action following Pieper's representation that "the duties and responsibilities were so time consuming that they felt the necessity to turn this over to an investment manager." The board appointed M & I as investment agent pursuant to an Investment Agency Agreement which bore an effective date of September 1, 1981. Pieper maintains that the Investment Agency Agreement removed his decisionmaking authority over disbursement of money from the Fund. But Samuel Lincoln continued to disburse loan funds on the direction of Landru, who in turn, continued to collect the three percent kickback which he then shared with Pieper. Specifically, Landru solicited mortgage loans from at least twelve individuals after execution of the August 20, 1981 Investment Agency Agreement. Overall, Landru received approximately $220,000 in kickbacks, which he split with Pieper. Neither Landru nor Pieper reported any of this income on their tax returns.

In addition to cash kickbacks, Pieper and Landru also received home improvements from George Bruch in return for seven loans. Specifically, Bruch performed work on Landru's and Pieper's homes that included building a room addition, a deck, and enclosing a porch. Not coincidentally, the fair market value of these improvements roughly equaled three percent of the aggregate value of Bruch's last seven loans. Bruch tendered to Pieper and Landru bogus receipts for the work.

On August 8, 1986, the grand jury returned a twenty-six count indictment against Pieper charging him with one count of conspiracy, twenty-one counts of soliciting and accepting graft to influence a pension plan, three counts of filing false income tax returns, and one RICO count. Pieper filed several unsuccessful pretrial motions, including a motion to dismiss counts two through twenty-two based on his alleged lack of authority over decisions relating to the Fund, and a motion to dismiss the RICO count based upon a deficient factual nexus between his activities and the conduct of the Fund's affairs.

The jury found Pieper guilty of the conspiracy, RICO, and tax counts as well as finding him guilty on eleven of twenty-one substantive counts of receiving a kickback because of his actions relating to matters concerning an employee pension fund. The jury also returned a special verdict that required Pieper to forfeit $48,951, a figure representing half of all the kickbacks paid on the counts on which he was convicted. This appeal followed.

## II.

We first consider Pieper's primary argument on appeal that the evidence was insufficient to support his conviction under 18 U.S.C. § 1954 because he did not receive the kickbacks "with an intent to be influenced with respect to any of his actions, decisions, or other duties relating to any question or matter concerning" the pension fund. In evaluating this argument we note that an appellant who challenges the sufficiency of the evidence to sustain a jury verdict of conviction bears a heavy burden. *United States v. Fulk,* 816 F.2d 1202, 1206 (7th Cir.1987); *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir.1987); *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983). We review the evidence in the light most favorable to the government and must sustain the verdict if *"any* rational trier of fact could have found guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). We conclude that the evidence presented at

trial was more than sufficient to sustain Pieper's conviction.

Conviction for a violation of 18 U.S.C. § 1954 requires that a trustee of an employee pension benefit fund receive or agree to receive or solicit

> any fee, kickback, commission, gift, loan, money or thing of value because of or with intent to be influenced with respect to any of his actions, decisions, or other duties relating to any question or matter concerning such plan.

Here, the gist of Pieper's argument is that under the terms of the Investment Agency Agreement by which the board designated M & I as investment agent for the Fund, he lacked either real or apparent authority to grant or deny the loans sought by the prospective mortgagees. Thus, Pieper contends he could not have accepted kickbacks "because of or with an intent to be influenced with respect to any decisions" concerning the Fund. Additionally, Pieper argues that he did not violate § 1954 because: (1) no potential customers knew that any union official was involved in the solicitation and no borrower who actually paid the so called "commissions" knew of his position, and (2) the assets of the fund were not "adversely affected" by his actions.

■ Pieper's argument fails for several reasons. First, Pieper mistakenly collapses the two prongs of § 1954. Under § 1954, a defendant may be convicted of receiving a kickback (a) "because of" *or* (b) "with intent to be influenced with respect to" any actions or decisions relating to the plan involved. *United States v. Friedland,* 660 F.2d 919, 925–26 (3d Cir.1981). In this case, Pieper was convicted of receiving kickbacks by virtue of his status, or in other words, *because* of his positions with the union and the Fund. Pieper's assertion that "he did not accept any renumeration to influence his actions with respect to any matters pending before the Fund's Board," a defense against the "intent" prong of § 1954, even if true, is irrelevant to a determination of whether the evidence was sufficient to support his conviction under the "because of" prong.

Also erroneous is Pieper's contention that he had no actual or apparent authority to control the investment decisions of the Fund and thus could not have violated § 1954. Here, Pieper argues that he lacked authority because following the board's August 20, 1981 decision to turn over the investment authority for the Fund to an investment manager, he "personally withdrew completely from investment management decisions." Under § 1954, it is not necessary that a defendant have had actual ability to control investment decisions of a pension fund so long as, because of his status, he had ostensible power over decisions regarding the fund. *Friedland, supra,* 660 F.2d at 925 (finding that attorneys who had served as general counsel to a pension plan and whom trustees consulted at meetings and on an *ad hoc* basis but who had no actual authority over the plan's investments were within the ambit of § 1954).

Here, the evidence taken in the light most favorable to the government establishes at a minimum that Pieper had ostensible authority over the Fund's investment decisions. The evidence showed: (1) that Pieper and Landru reached their kickback agreement prior to the board of trustee's August 20, 1981 decision to follow Pieper's suggestion and relieve him of his investment responsibilities, and (2) that the terms of the agreement allowed the kickback scheme to proceed without Pieper's daily participation. For this reason, Pieper's contention that, following the adoption of the Investment Agency Agreement, he had no connection with any of the loans made by Landru rings rather hollow. After all, it was he who instructed Lincoln to make the loans Landru authorized. Contrary to Pieper's contention, what this alleged non-participation shows is that the scheme set in place by Pieper and Landru in July of 1981 was indeed working as intended with little or no effort on Pieper's part except to receive his share of the kickbacks.

Also without basis in the statute or case law is Pieper's contention that he can be found to have violated the "because of" prong of § 1954 only if the borrowers paying the kickback either knew of his position with the union or were told by Landru that he was splitting the three percent kickback with a union official. To put the matter slightly differently, Pieper argues that where no borrower who paid the kickback knew of Pieper's position, he cannot be said to have received kickbacks "because of" his position with the union.

This argument is flawed because it erroneously focuses on the state of mind of the individuals paying the kickbacks rather than on Pieper's actual receipt of the kickbacks. For the jury to have convicted Pieper under § 1954, the government did not have to prove that Pieper received any payments in order to influence his acts or decisions. Rather, the government needed only to establish that Pieper received these kickbacks "because of" his status, which gave him at least ostensible authority to exercise influence over the Fund's investment decisions or select the people who did. *See United States v. Romano,* 684 F.2d 1057, 1063–64 (2d Cir.1982) ("If only corrupt transactions were intended to be covered, Congress would not have added the 'because of' clause, but would have limited the statute to those possessing the intent to be influenced."). And as we have already noted, the evidence on this point was sufficient to sustain the jury's conviction.

To accept Pieper's position would be to create a loophole in the statute by which illegal acts would become decriminalized through delegations and subterfuge. Such a result would fly in the face of Congress' clearly expressed legislative intent "to reach all fiduciaries who profit (other than by regular compensation) as a result of their decisions to invest union pension funds." *Romano, supra,* 684 F.2d at 1064; S.Rep. No. 908, 87th Cong., 1st Sess., 4–5, 11 (1961). In addition, it is worth noting that Pieper is mistaken in asserting that no borrower knew of his position with the Fund. George Bruch, the local contractor who built the room addition and the wood deck onto Pieper's home in Muskego in exchange for seven loans from the Fund, obviously knew that Pieper was both a

**1026**

trustee of the Fund, an officer of Local 433, and played a role in Bruch's loans.

■ Finally, we hold that the evidence could even have supported a finding that Pieper retained actual authority over the investment decisions of the fund. Here, the board of trustees' August 20, 1981 resolution (adopted on Pieper's recommendation) to turn the Fund over to an investment manager and the subsequent Investment Agency Agreement entered into by the board and M & I did not divest the trustees of all authority over disbursement of Fund assets. At most, the board's action relieved Pieper and fellow trustee Robert Trapp only of the *responsibility* to act as investment managers for the fund. But responsibility and authority are different concepts.

The language of the Investment Agency Agreement specifically provided that M & I's duties shall be "as directed by trustees." Nothing in this agreement indicated that M & I was to act wholly independently of the board of trustees in the face of this specific "direction." Pieper's assertion that he "personally withdrew" from investment management decisions following the board's resolution tells only half the story. For while Pieper may not have retained the authority to act *personally* over decisions concerning the acceptance or rejection of real estate loan applications, he clearly retained authority as chairman of the board of trustees to order the board's agent, M & I, to act in a specific manner and did so by ordering Lincoln to make the loans approved by Landru.

### III.

We next turn to Pieper's challenges to his RICO conviction. Pieper contends that he did not violate § 1962(c) because: (1) he did not commit the requisite predicate offenses, and (2) the evidence was insufficient to show a connection between his racketeering activity and the affairs of the Fund such that a jury could find that he "participat[ed], directly or indirectly, in the conduct" of the affairs of the enterprise. Because we have already found the evidence was sufficient to permit the jury to

conclude beyond a reasonable doubt that Pieper violated § 1954, we need only address Pieper's argument that there was insufficient evidence to support the RICO conviction because the government failed to prove any effect upon the enterprise from his solicitation and acceptance of kickbacks.

■ To establish the nexus required by § 1962(c) between the racketeering activity and the affairs of the enterprise, this circuit has held that the government must show that: (1) the defendant committed the racketeering acts, (2) the defendant's position in or relation with the enterprise facilitated commission of the acts, and (3) the acts had "some effect" on the enterprise. *United States v. Blackwood,* 768 F.2d 131, 138 (7th Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985); *United States v. Horak,* 833 F.2d 1235, 1239 (7th Cir.1987). Effect on the enterprise is established by proof that "the racketeering acts affected the enterprise in some fashion." *Blackwood, supra,* 768 F.2d at 138.

With these principles in mind, we turn to the record. Pieper maintains that the government failed to prove the requisite nexus beyond a reasonable doubt because the kickback scheme was "wholly unrelated to any activities involving [his] union position or his position with the Fund ... [and] had absolutely no bearing upon the conduct of the Fund's business." Specifically, Pieper maintains that Lincoln did not approve all loans which Landru recommended, and that in any event, "Landru did not expect his payments to Pieper would result in assistance with loans being granted." Thus, Pieper concludes the evidence presented to the jury did not support the RICO conviction because the government failed to prove any effect upon the enterprise from Pieper's solicitation and acceptance of kickbacks.

■ Viewing the evidence in the light most favorable to the government, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Pieper participated in the conduct of the affairs of the Fund through racketeering

and that this affected the enterprise. First, if not for Pieper's position as Chairman of the Board of Trustees of the Fund, he would have been unable to formulate and later to benefit from the kickback scheme. Second, the agreement directly and improperly affected the Fund's activities: loan decisions were based at least in part on the willingness of borrowers to pay kickbacks. Third, the payment of a kickback may well have adversely had "some effect" on the borrower's ability to make repayment. Thus, the connection between Pieper's kickback activities and the affairs of the Fund is clear. Accordingly, Pieper's claim that there existed no nexus between his activities and the conduct of the Fund must fail.

### IV.

Pieper next challenges the district court's refusal to grant his motion to dismiss counts 5, 13, 14, 15, 16, 19 and 22 on grounds of multiplicity. Each of these counts charged Pieper with having unlawfully solicited and received building materials and construction services on his home from George Bruch in exchange for various loan commitments from the Fund. The seven counts alleged seven separate loans, some to Bruch individually and others to an organization called KBC Partnership, in which Bruch was a partner.

In this circuit the test for multiplicity is "whether each count 'requires proof of a fact which the other does not.'" *United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir.1986) (citations omitted). Here, Pieper alleges that the counts corresponding to the seven loans to George Bruch are multiplicitous because "the issue is not how many loans were secured [but] how many 'things of value' ... the defendant receive[d]." Pieper thus contends that, because he received but "a single benefit" (the various home improvement services), the district court erred in denying his motion to dismiss the allegedly multiplicitous counts.

■ We disagree. To begin with, Pieper received more than one benefit. The record shows that Bruch and his workers spent considerable time working on Pieper's two home improvement projects and on Landru's single project. In any event, where separate counts involve "distinct facts"—i.e., different dates, different methods of misapplication, and different sums, there is no multiplicity. *Marquardt, supra*, 786 F.2d at 778. Here, although the jury may not have been able to tie a particular home improvement service to a particular loan Bruch received, § 1954 requires only that a trustee receive a "thing of value" because of a decision concerning the plan. *Romano, supra*, 684 F.2d 1063–64. Moreover, with one exception, the suspect loans involved different dates and amounts. The exception involved counts 13 and 15, in which two separate loans for the same amount were issued on the same day, but were collateralized by two separate properties. The government, therefore, did not prejudice the jury against Pieper by "creating the impression of more criminal activity on his part than in fact may have been present." *Marquardt, supra*, 786 F.2d at 778. Accordingly, we conclude that because counts 5, 13, 14, 15, 16, 19 and 22 state separate offenses which required separate proof, they are not multiplicious.

### V.

■ Finally, Pieper challenges as an abuse of discretion the district court's decision to: (1) assess him certain costs of prosecution, and (2) award the government the costs of court reporter fees for daily transcripts. Our review of the district court's cost discretion is very narrow: only where a clear abuse of discretion is shown can we overturn an award of costs. *In re Nissan Antitrust Litigation*, 577 F.2d 910, 918 (5th Cir.1978). On the allocation question, we find that the district court's refusal to prorate some of the costs of prosecution was not improper. The general rule is that costs associated *exclusively* with the unsuccessful prosecution of a defendant or his acquittal on specific counts may not be assessed against him. *United States v. Fowler*, 794 F.2d 1446, 1450 (9th Cir.1986). In this case the district court specifically found that much of the evidence presented

at trial served a dual purpose: it related to the tax and conspiracy counts (on which Pieper was convicted) as well as to ten of the twenty-one counts of receiving kickbacks on which Pieper was acquitted. Thus, the district court did not abuse its discretion in taxing Pieper the costs associated with the prosecution of both the successful and the related unsuccessful counts.

■ The district court's award of costs for "daily" transcripts (totaling $347.50) is a different story. Where the additional expense of an expedited transcript is obtained merely for "the convenience of the attorney," such an award is an abuse of discretion. *Newman v. A.E. Staley Manufacturing Company*, 648 F.2d 330, 336 (5th Cir.1981). Here, the district judge found that the daily transcripts were "necessarily obtained for use in the case" because the prosecution "needed" the transcripts "to prepare for defendant's cross examination and for closing argument." Thus, by the district court's own description, the daily transcripts were needed for the prosecution's convenience, to wit, to prepare for its cross-examination of Pieper and closing argument. This award was therefore improper and upon remand the order awarding costs must be modified to delete the cost of the daily transcripts.

## VI.

To summarize, we affirm Pieper's various convictions. We reverse the award of daily transcript costs and remand for modification of the order awarding costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.